Hillary Goodridge & others[1] vs. Department of Public Health & another.[2]

Suffolk. March 4, 2003. - November 18, 2003.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*License. Marriage. Statute,* Construction. *Constitutional Law,* Police power, Equal protection of laws. *Due Process of Law,* Marriage. *Words,* "Marriage."

Summary of the provisions of G. L. c. 207, which controls entry into civil marriage. [317-318]

This court concluded that G. L. c. 207 may not be construed to permit same-sex couples to marry. [318-320]

Discussion of the nature of civil marriage, the private and social advantages it bestows, and the tangible as well as intangible benefits that flow from marriage. [320-327]

This court concluded that barring an individual from the protections, benefits, and obligations of civil marriage solely because that person would marry a person of the same sex violated the Massachusetts Constitution in that such a marriage ban did not meet the rational basis test for either due process or equal protection, where the Commonwealth failed to identify any constitutionally adequate reason for denying civil marriage to same-sex couples. [327-342] Greaney, J., concurring; Spina, J., Sosman, J., Cordy, J., dissenting.

This court reformulated the common-law definition of civil marriage to mean the voluntary union of two persons as spouses, to the exclusion of all others; further, the court, in remanding the case to the Superior Court for entry of judgment consistent with this opinion, ordered that entry of judgment be stayed for 180 days to permit the Legislature to take such action as it may deem appropriate in light of this opinion. [342-344] Greaney, J., concurring; Spina, J., Sosman, J., Cordy, J., dissenting.

Greaney, J., concurred with the result reached by the court, the remedy ordered, and much of the reasoning in the court's opinion, but expressed the view that the case would have been more directly resolved using traditional equal protection analysis. [344-350]

Spina, J., with whom Sosman and Cordy, JJ., joined, dissented on the basis that what was at stake in the case was not the unequal treatment of individuals or whether individual rights had been impermissibly burdened, but the power of the Legislature to effectuate social change without interference from the courts, pursuant to art. 30 of the Massachusetts Declaration of Rights. [350-357]

[1]Julie Goodridge, David Wilson, Robert Compton, Michael Horgan, Edward Balmelli, Maureen Brodoff, Ellen Wade, Gary Chalmers, Richard Linnell, Heidi Norton, Gina Smith, Gloria Bailey, and Linda Davies.

[2]Commissioner of Public Health.

SOSMAN, J., with whom Spina and Cordy, JJ., joined, dissented, stating that the issue was not whether the Legislature's rationale behind the statutory scheme being challenged was persuasive to the court, but whether it was rational for the Legislature to reserve judgment on whether changing the definition of marriage could be made at this time without damaging the institution of marriage or adversely affecting the critical role it has played in our society. [357-363]

CORDY, J., with whom Spina and Sosman, JJ., joined, dissented on the ground that the marriage statute, as historically interpreted to mean the union of one man and one woman, did not violate the Massachusetts Constitution because the Legislature could rationally conclude that it furthered the legitimate State purpose of ensuring, promoting, and supporting an optimal social structure for the bearing and raising of children. [363-395]

CIVIL ACTION commenced in the Superior Court Department on April 11, 2001.

The case was heard by *Thomas E. Connolly,* J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Mary Lisa Bonauto* (*Gary D. Buseck* with her) for Hillary Goodridge.

*Judith S. Yogman,* Assistant Attorney General, for Department of Public Health.

The following submitted briefs for amici curiae:

*Joseph P.J. Vrabel, Mark D. Mason, & Martin W. Healy* for Massachusetts Bar Association.

*Leslie Cooper & James D. Esseks,* of New York, *Jon W. Davidson & Shannon Minter,* of California, *Elliot M. Mincberg & Judith E. Schaeffer,* of the District of Columbia, *& John Reinstein, Sarah R. Wunsch, Paul Holtzman, & Hugh Dun Rappaport* for Urban League of Eastern Massachusetts & others.

*Paul Benjamin Linton,* of Illinois, *& Thomas M. Harvey* for Robert J. Araujo & others.

*Dwight G. Duncan* for Massachusetts Family Institute, Inc., & others.

*Glen Lavy,* of Arizona, *Stephen W. Reed,* of California, *& Bertin C. Emmons* for National Association for Research and Therapy of Homosexuality, Inc., & others.

*Robert W. Ash & Vincent P. McCarthy,* of Connecticut, *& Philip E. Cleary* for The Common Good Foundation & others.

*Don Stenberg*, Attorney General of Nebraska, *Mark L. Shurt-leff*, Attorney General of Utah, *Brent A. Burnett*, Assistant Attorney General of Utah, & *Mark Barnett*, Attorney General of South Dakota, for the State of Utah & others.

*Chester Darling & Michael Williams* for Massachusetts Citizens Alliance & another.

*Daniel Avila* for The Catholic Action League of Massachusetts.

*Joshua K. Baker*, of California, & *Robert G. Caprera* for José Martín de Agar & others.

*Wendy J. Herdlein*, of California, & *James R. Knudsen* for the Honorable Philip Travis & others.

*Steven W. Fitschen*, of Virginia, for The National Legal Foundation.

*Jeffrey A. Shafer & David R. Langdon*, of Ohio, *William C. Duncan*, of Utah, & *Wendy J. Herdlein*, of California, for Marriage Law Project.

*Lisa Rae, Kenneth Elmore, Arthur Berney, & Josephine Ross* for The Religious Coalition for the Freedom to Marry & others.

*Ann DiMaria* for The Ethics & Religious Liberty Commission & others.

*Anthony Mirenda, Vickie L. Henry, Lucy Fowler, John M. Granberry, Rachel N. Lessem, & Gabriel M. Helmer* for Robert F. Williams & others.

*Kenneth J. Parsigian* for Peter W. Bardaglio & others.

*David Cruz*, of New York, *John Taylor Williams, Carol V. Rose, Debra Squires-Lee, Christopher Morrison, & Marni Goldstein Caputo* for William E. Adams & others.

*Martin J. Newhouse & Katharine Bolland* for Coalition gaie et lesbienne du Québec & others.

*Joseph Ureneck*, pro se.

*Teresa S. Collett*, of Texas, & *Luke Stanton* for Free Market Foundation.

*Peter F. Zupcofska, L. Tracee Whitley, Heidi A. Nadel, & Corin R. Swift* for Boston Bar Association & another.

*Mary Jo Johnson, Jonathan A. Shapiro, & Amy L. Nash* for The Massachusetts Psychiatric Society & others.

*Tony R. Maida, Nina Joan Kimball, & Justine H. Brousseau* for Libby Adler & others.

*Daryl J. Lapp, Kevin D. Batt, & Katharine Silbaugh* for Monroe Inker & another.

*David Zwiebel, Mordechai Biser, & Nathan J. Diament,* of New York, *& Abba Cohen,* of the District of Columbia, for Agudath Israel of America & others.

MARSHALL, C.J. Marriage is a vital social institution. The exclusive commitment of two individuals to each other nurtures love and mutual support; it brings stability to our society. For those who choose to marry, and for their children, marriage provides an abundance of legal, financial, and social benefits. In return it imposes weighty legal, financial, and social obligations. The question before us is whether, consistent with the Massachusetts Constitution, the Commonwealth may deny the protections, benefits, and obligations conferred by civil marriage to two individuals of the same sex who wish to marry. We conclude that it may not. The Massachusetts Constitution affirms the dignity and equality of all individuals. It forbids the creation of second-class citizens. In reaching our conclusion we have given full deference to the arguments made by the Commonwealth. But it has failed to identify any constitutionally adequate reason for denying civil marriage to same-sex couples.

We are mindful that our decision marks a change in the history of our marriage law. Many people hold deep-seated religious, moral, and ethical convictions that marriage should be limited to the union of one man and one woman, and that homosexual conduct is immoral. Many hold equally strong religious, moral, and ethical convictions that same-sex couples are entitled to be married, and that homosexual persons should be treated no differently than their heterosexual neighbors. Neither view answers the question before us. Our concern is with the Massachusetts Constitution as a charter of governance for every person properly within its reach. "Our obligation is to define the liberty of all, not to mandate our own moral code." *Lawrence* v. *Texas,* 123 S. Ct. 2472, 2480 (2003) (*Lawrence*), quoting *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U.S. 833, 850 (1992).

Whether the Commonwealth may use its formidable regula-

tory authority to bar same-sex couples from civil marriage is a question not previously addressed by a Massachusetts appellate court.[3] It is a question the United States Supreme Court left open as a matter of Federal law in *Lawrence, supra* at 2484, where it was not an issue. There, the Court affirmed that the core concept of common human dignity protected by the Fourteenth Amendment to the United States Constitution precludes government intrusion into the deeply personal realms of consensual adult expressions of intimacy and one's choice of an intimate partner. The Court also reaffirmed the central role that decisions whether to marry or have children bear in shaping one's identity. *Id.* at 2481. The Massachusetts Constitution is, if anything, more protective of individual liberty and equality than the Federal Constitution; it may demand broader protection for fundamental rights; and it is less tolerant of government intrusion into the protected spheres of private life.

Barred access to the protections, benefits, and obligations of civil marriage, a person who enters into an intimate, exclusive union with another of the same sex is arbitrarily deprived of membership in one of our community's most rewarding and cherished institutions. That exclusion is incompatible with the constitutional principles of respect for individual autonomy and equality under law.

I

The plaintiffs are fourteen individuals from five Massachusetts counties. As of April 11, 2001, the date they filed their complaint, the plaintiffs Gloria Bailey, sixty years old, and Linda Davies, fifty-five years old, had been in a committed relationship for thirty years; the plaintiffs Maureen Brodoff, forty-nine years old, and Ellen Wade, fifty-two years old, had been in a committed

---

[3]For American appellate courts that have recently addressed this issue, see *Standhardt* v. *Superior Court*, 77 P.3d 451 (Ariz. Ct. App. 2003); *Dean* v. *District of Columbia*, 653 A.2d 307 (D.C. 1995); *Baehr* v. *Lewin*, 74 Haw. 530 (1993); *Baker* v. *State*, 170 Vt. 194, 242 (1999). Earlier cases include *Adams* v. *Howerton*, 486 F. Supp. 1119 (C.D. Cal. 1980), aff'd, 673 F.2d 1036 (9th Cir.), cert. denied, 458 U.S. 1111 (1982); *Jones* v. *Hallahan*, 501 S.W.2d 588 (Ky. Ct. App. 1973); *Baker* v. *Nelson*, 291 Minn. 310 (1971), appeal dismissed, 409 U.S. 810 (1972); *Singer* v. *Hara*, 11 Wash. App. 247 (1974). See also *Halpern* v. *Toronto (City)*, 172 O.A.C. 276 (2003); *Egale Canada, Inc.* v. *Canada (Attorney Gen.)*, 13 B.C.L.R. (4th) 1 (2003).

relationship for twenty years and lived with their twelve year old daughter; the plaintiffs Hillary Goodridge, forty-four years old, and Julie Goodridge, forty-three years old, had been in a committed relationship for thirteen years and lived with their five year old daughter; the plaintiffs Gary Chalmers, thirty-five years old, and Richard Linnell, thirty-seven years old, had been in a committed relationship for thirteen years and lived with their eight year old daughter and Richard's mother; the plaintiffs Heidi Norton, thirty-six years old, and Gina Smith, thirty-six years old, had been in a committed relationship for eleven years and lived with their two sons, ages five years and one year; the plaintiffs Michael Horgan, forty-one years old, and Edward Balmelli, forty-one years old, had been in a committed relationship for seven years; and the plaintiffs David Wilson, fifty-seven years old, and Robert Compton, fifty-one years old, had been in a committed relationship for four years and had cared for David's mother in their home after a serious illness until she died.

The plaintiffs include business executives, lawyers, an investment banker, educators, therapists, and a computer engineer. Many are active in church, community, and school groups. They have employed such legal means as are available to them — for example, joint adoption, powers of attorney, and joint ownership of real property — to secure aspects of their relationships. Each plaintiff attests a desire to marry his or her partner in order to affirm publicly their commitment to each other and to secure the legal protections and benefits afforded to married couples and their children.

The Department of Public Health (department) is charged by statute with safeguarding public health. See G. L. c. 17. Among its responsibilities, the department oversees the registry of vital records and statistics (registry), which "enforce[s] all laws" relative to the issuance of marriage licenses and the keeping of marriage records, see G. L. c. 17, § 4, and which promulgates policies and procedures for the issuance of marriage licenses by city and town clerks and registers. See, e.g., G. L. c. 207, §§ 20, 28A, and 37. The registry is headed by a registrar of vital records and statistics (registrar), appointed by the Commissioner of Public Health (commissioner) with the approval of the public health council and supervised by the commissioner. See G. L. c. 17, § 4.

In March and April, 2001, each of the plaintiff couples attempted to obtain a marriage license from a city or town clerk's office. As required under G. L. c. 207, they completed notices of intention to marry on forms provided by the registry, see G. L. c. 207, § 20, and presented these forms to a Massachusetts town or city clerk, together with the required health forms and marriage license fees. See G. L. c. 207, § 19. In each case, the clerk either refused to accept the notice of intention to marry or denied a marriage license to the couple on the ground that Massachusetts does not recognize same-sex marriage.[4],[5] Because obtaining a marriage license is a necessary prerequisite to civil marriage in Massachusetts, denying marriage licenses to the plaintiffs was tantamount to denying them access to civil marriage itself, with its appurtenant social and legal protections, benefits, and obligations.[6]

On April 11, 2001, the plaintiffs filed suit in the Superior Court against the department and the commissioner seeking a judgment that "the exclusion of the [p]laintiff couples and other

[4]General Laws c. 207, § 37, provides: "The commissioner of public health shall furnish to the clerk or registrar of every town a printed list of all legal impediments to marriage, and the clerk or registrar shall forthwith post and thereafter maintain it in a conspicuous place in his office." The record does not reveal whether any of the clerks' offices that considered the plaintiffs' applications for a marriage license had posted such a list of impediments, or whether such list included as an impediment that the applicants are of the same sex.

[5]The plaintiffs alleged that they met all of the facial qualifications to obtain marriage licenses pursuant to G. L. c. 207, and the department does not contest this assertion.

[6]The complaint alleged various circumstances in which the absence of the full legal protections of civil marriage has harmed them and their children. For example, Hillary and Julie Goodridge alleged that, when Julie gave birth to their daughter (whom Hillary subsequently coadopted) during a delivery that required the infant's transfer to neonatal intensive care, Hillary "had difficulty gaining access to Julie and their newborn daughter at the hospital"; Gary Chalmers and Richard Linnell alleged that "Gary pays for a family health insurance policy at work which covers only him and their daughter because Massachusetts law does not consider Rich to be a 'dependent.' This means that their household must purchase a separate individual policy of health insurance for Rich at considerable expense. . . . Gary has a pension plan at work, but under state law, because he is a municipal employee, that plan does not allow him the same range of options in providing for his beneficiary that a married spouse has and thus he cannot provide the same security to his family that a married person could if he should predecease Rich."

qualified same-sex couples from access to marriage licenses, and the legal and social status of civil marriage, as well as the protections, benefits and obligations of marriage, violates Massachusetts law." See G. L. c. 231A. The plaintiffs alleged violation of the laws of the Commonwealth, including but not limited to their rights under arts. 1, 6, 7, 10, 12, and 16, and Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution.[7,8] The department, represented by the Attorney General, admitted to a policy and practice of denying marriage licenses to same-sex

---

[7]Article 1, as amended by art. 106 of the Amendments to the Massachusetts Constitution, provides: "All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

Article 6 provides: "No man, nor corporation, or association of men, have any other title to obtain advantages, or particular and exclusive privileges, distinct from those of the community, than what arises from the consideration of services rendered to the public . . . ."

Article 7 provides: "Government is instituted for the common good; for the protection, safety, prosperity, and happiness of the people; and not for the profit, honor, or private interest of any one man, family or class of men: Therefore the people alone have an incontestable, unalienable, and indefeasible right to institute government; and to reform, alter, or totally change the same, when their protection, safety, prosperity and happiness require it."

Article 10 provides, in relevant part: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws . . . ."

Article 12 provides, in relevant part: "[N]o subject shall be . . . deprived of his property, immunities, or privileges, put out of the protection of the law . . . or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land."

Article 16, as amended by art. 77 of the Amendments, provides, in relevant part: "The right of free speech shall not be abridged." Part II, c. 1, § 1, art. 4, as amended by art. 112, provides, in pertinent part, that "full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, and ordinances, directions and instructions, either with penalties or without; so as the same be not repugnant or contrary to this constitution, as they shall judge to be for the good and welfare of this Commonwealth."

[8]The department claims that the plaintiffs have waived their art. 12 and art. 16 claims on appeal. Because our holding today does not turn on art. 12 or art. 16, we do not consider the department's waiver argument.

couples. It denied that its actions violated any law or that the plaintiffs were entitled to relief. The parties filed cross motions for summary judgment.

A Superior Court judge ruled for the department. In a memorandum of decision and order dated May 7, 2002, he dismissed the plaintiffs' claim that the marriage statutes should be construed to permit marriage between persons of the same sex, holding that the plain wording of G. L. c. 207, as well as the wording of other marriage statutes, precluded that interpretation. Turning to the constitutional claims, he held that the marriage exclusion does not offend the liberty, freedom, equality, or due process provisions of the Massachusetts Constitution, and that the Massachusetts Declaration of Rights does not guarantee "the fundamental right to marry a person of the same sex." He concluded that prohibiting same-sex marriage rationally furthers the Legislature's legitimate interest in safeguarding the "primary purpose" of marriage, "procreation." The Legislature may rationally limit marriage to opposite-sex couples, he concluded, because those couples are "theoretically . . . capable of procreation," they do not rely on "inherently more cumbersome" noncoital means of reproduction, and they are more likely than same-sex couples to have children, or more children.

After the complaint was dismissed and summary judgment entered for the defendants, the plaintiffs appealed. Both parties requested direct appellate review, which we granted.

## II

Although the plaintiffs refer in passing to "the marriage statutes," they focus, quite properly, on G. L. c. 207, the marriage licensing statute, which controls entry into civil marriage. As a preliminary matter, we summarize the provisions of that law.

General Laws c. 207 is both a gatekeeping and a public records statute. It sets minimum qualifications for obtaining a marriage license and directs city and town clerks, the registrar, and the department to keep and maintain certain "vital records" of civil marriages. The gatekeeping provisions of G. L. c. 207 are minimal. They forbid marriage of individuals within certain

degrees of consanguinity, §§ 1 and 2, and polygamous marriages. See G. L. c. 207, § 4. See also G. L. c. 207, § 8 (marriages solemnized in violation of §§ 1, 2, and 4, are void ab initio). They prohibit marriage if one of the parties has communicable syphilis, see G. L. c. 207, § 28A, and restrict the circumstances in which a person under eighteen years of age may marry. See G. L. c. 207, §§ 7, 25, and 27. The statute requires that civil marriage be solemnized only by those so authorized. See G. L. c. 207, §§ 38-40.

The record-keeping provisions of G. L. c. 207 are more extensive. Marriage applicants file standard information forms and a medical certificate in any Massachusetts city or town clerk's office and tender a filing fee. G. L. c. 207, §§ 19-20, 28A. The clerk issues the marriage license, and when the marriage is solemnized, the individual authorized to solemnize the marriage adds additional information to the form and returns it (or a copy) to the clerk's office. G. L. c. 207, §§ 28, 30, 38-40 (this completed form is commonly known as the "marriage certificate"). The clerk sends a copy of the information to the registrar, and that information becomes a public record. See G. L. c. 17, § 4; G. L. c. 66, § 10.[9,10]

In short, for all the joy and solemnity that normally attend a marriage, G. L. c. 207, governing entrance to marriage, is a licensing law. The plaintiffs argue that because nothing in that licensing law specifically prohibits marriages between persons of the same sex, we may interpret the statute to permit "qualified same sex couples" to obtain marriage licenses, thereby avoiding the question whether the law is constitutional. See

---

[9]The marital forms forwarded by the clerk or register must contain the "date of record, date and place of marriage, name, residence and official station of the person by whom solemnized; for each of the parties to be married the name, date and place of birth, residence, age, number of the marriage, as first or second, and if previously married, whether widowed or divorced, and the birth-given names of their parents." G. L. c. 46, § 1.

[10]"The record of a marriage made and kept as provided by law by the person by whom the marriage was solemnized, or by the clerk or registrar, or a copy thereof duly certified, shall be prima facie evidence of such marriage." G. L. c. 207, § 45. A "certificate of the [c]ommissioner's copy, signed by the [c]ommissioner or the [r]egistar, is admissible as evidence of the record." *Secretary of the Commonwealth* v. *City Clerk of Lowell,* 373 Mass. 178, 181-182 (1977).

*School Comm. of Greenfield* v. *Greenfield Educ. Ass'n*, 385 Mass. 70, 79 (1982), and cases cited. This claim lacks merit.

We interpret statutes to carry out the Legislature's intent, determined by the words of a statute interpreted according to "the ordinary and approved usage of the language." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). The everyday meaning of "marriage" is "[t]he legal union of a man and woman as husband and wife," Black's Law Dictionary 986 (7th ed. 1999), and the plaintiffs do not argue that the term "marriage" has ever had a different meaning under Massachusetts law. See, e.g., *Milford* v. *Worcester*, 7 Mass. 48, 52 (1810) (marriage "is an engagement, by which a single man and a single woman, of sufficient discretion, take each other for husband and wife"). This definition of marriage, as both the department and the Superior Court judge point out, derives from the common law. See *Commonwealth* v. *Knowlton*, 2 Mass. 530, 535 (1807) (Massachusetts common law derives from English common law except as otherwise altered by Massachusetts statutes and Constitution). See also *Commonwealth* v. *Lane*, 113 Mass. 458, 462-463 (1873) ("when the statutes are silent, questions of the validity of marriages are to be determined by the jus gentium, the common law of nations"); C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice § 1.2 (3d ed. 2002). Far from being ambiguous, the undefined word "marriage," as used in G. L. c. 207, confirms the General Court's intent to hew to the term's common-law and quotidian meaning concerning the genders of the marriage partners.

The intended scope of G. L. c. 207 is also evident in its consanguinity provisions. See *Chandler* v. *County Comm'rs of Nantucket County*, 437 Mass. 430, 435 (2002) (statute's various provisions may offer insight into legislative intent). Sections 1 and 2 of G. L. c. 207 prohibit marriages between a man and certain female relatives and a woman and certain male relatives, but are silent as to the consanguinity of male-male or female-female marriage applicants. See G. L. c. 207, §§ 1-2. The only reasonable explanation is that the Legislature did not intend that same-sex couples be licensed to marry. We conclude, as did the

judge, that G. L. c. 207 may not be construed to permit same-sex couples to marry.[11]

## III

### A

The larger question is whether, as the department claims, government action that bars same-sex couples from civil marriage constitutes a legitimate exercise of the State's authority to regulate conduct, or whether, as the plaintiffs claim, this categorical marriage exclusion violates the Massachusetts Constitution. We have recognized the long-standing statutory understanding, derived from the common law, that "marriage" means the lawful union of a woman and a man. But that history cannot and does not foreclose the constitutional question.

The plaintiffs' claim that the marriage restriction violates the Massachusetts Constitution can be analyzed in two ways. Does it offend the Constitution's guarantees of equality before the law? Or do the liberty and due process provisions of the Massachusetts Constitution secure the plaintiffs' right to marry their chosen partner? In matters implicating marriage, family life, and the upbringing of children, the two constitutional concepts frequently overlap, as they do here. See, e.g., *M.L.B.* v. *S.L.J.*, 519 U.S. 102, 120 (1996) (noting convergence of due process and equal protection principles in cases concerning parent-child relationships); *Perez* v. *Sharp*, 32 Cal. 2d 711, 728 (1948) (analyzing statutory ban on interracial marriage as equal protection violation concerning regulation of fundamental right). See also *Lawrence, supra* at 2482 ("Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests"); *Bolling* v. *Sharpe*, 347 U.S. 497 (1954) (racial

[11]We use the terms "same sex" and "opposite sex" when characterizing the couples in question, because these terms are more accurate in this context than the terms "homosexual" or "heterosexual," although at times we use those terms when we consider them appropriate. Nothing in our marriage law precludes people who identify themselves (or who are identified by others) as gay, lesbian, or bisexual from marrying persons of the opposite sex. See *Baehr* v. *Lewin*, 74 Haw. 530, 543 n.11, 547 n.14 (1993).

segregation in District of Columbia public schools violates the due process clause of Fifth Amendment to United States Constitution), decided the same day as *Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483 (1954) (holding that segregation of public schools in States violates equal protection clause of Fourteenth Amendment). Much of what we say concerning one standard applies to the other.

We begin by considering the nature of civil marriage itself. Simply put, the government creates civil marriage. In Massachusetts, civil marriage is, and since pre-Colonial days has been, precisely what its name implies: a wholly secular institution. See *Commonwealth* v. *Munson*, 127 Mass. 459, 460-466 (1879) (noting that "[i]n Massachusetts, from very early times, the requisites of a valid marriage have been regulated by statutes of the Colony, Province, and Commonwealth," and surveying marriage statutes from 1639 through 1834). No religious ceremony has ever been required to validate a Massachusetts marriage. *Id.*

In a real sense, there are three partners to every civil marriage: two willing spouses and an approving State. See *DeMatteo* v. *DeMatteo*, 436 Mass. 18, 31 (2002) ("Marriage is not a mere contract between two parties but a legal status from which certain rights and obligations arise"); *Smith* v. *Smith*, 171 Mass. 404, 409 (1898) (on marriage, the parties "assume[] new relations to each other and to the State"). See also *French* v. *McAnarney*, 290 Mass. 544, 546 (1935). While only the parties can mutually assent to marriage, the terms of the marriage — who may marry and what obligations, benefits, and liabilities attach to civil marriage — are set by the Commonwealth. Conversely, while only the parties can agree to end the marriage (absent the death of one of them or a marriage void ab initio), the Commonwealth defines the exit terms. See G. L. c. 208.

Civil marriage is created and regulated through exercise of the police power. See *Commonwealth* v. *Stowell*, 389 Mass. 171, 175 (1983) (regulation of marriage is properly within the scope of the police power). "Police power" (now more commonly termed the State's regulatory authority) is an old-fashioned term for the Commonwealth's lawmaking authority, as bounded by the liberty and equality guarantees of the Mas-

sachusetts Constitution and its express delegation of power from the people to their government. In broad terms, it is the Legislature's power to enact rules to regulate conduct, to the extent that such laws are "necessary to secure the health, safety, good order, comfort, or general welfare of the community" (citations omitted). *Opinion of the Justices,* 341 Mass. 760, 785 (1960).[12] See *Commonwealth* v. *Alger,* 7 Cush. 53, 85 (1851).

Without question, civil marriage enhances the "welfare of the community." It is a "social institution of the highest importance." *French* v. *McAnarney, supra.* Civil marriage anchors an ordered society by encouraging stable relationships over transient ones. It is central to the way the Commonwealth identifies individuals, provides for the orderly distribution of property, ensures that children and adults are cared for and supported whenever possible from private rather than public funds, and tracks important epidemiological and demographic data.

Marriage also bestows enormous private and social advantages on those who choose to marry. Civil marriage is at once a deeply personal commitment to another human being and a highly public celebration of the ideals of mutuality, companionship, intimacy, fidelity, and family. "It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects." *Griswold* v. *Connecticut,* 381 U.S. 479, 486 (1965). Because it fulfils yearnings for security, safe haven, and connection that express our common humanity, civil marriage is an esteemed institution, and the decision whether and whom to marry is among life's momentous acts of self-definition.

Tangible as well as intangible benefits flow from marriage. The marriage license grants valuable property rights to those who meet the entry requirements, and who agree to what might otherwise be a burdensome degree of government regulation of their activities.[13] See *Leduc* v. *Commonwealth,* 421 Mass. 433,

---

[12]"The term public welfare has never been and cannot be precisely defined. Sometimes it has been said to include public convenience, comfort, peace and order, prosperity, and similar concepts, but not to include 'mere expediency.' " *Opinion of the Justices,* 333 Mass. 773, 778 (1955).

[13]For example, married persons face substantial restrictions, simply because they are married, on their ability freely to dispose of their assets. See, e.g.,

435 (1995), cert. denied, 519 U.S. 827 (1996) ("The historical aim of licensure generally is preservation of public health, safety, and welfare by extending the public trust only to those with proven qualifications"). The Legislature has conferred on "each party [in a civil marriage] substantial rights concerning the assets of the other which unmarried cohabitants do not have." *Wilcox* v. *Trautz*, 427 Mass. 326, 334 (1998). See *Collins* v. *Guggenheim*, 417 Mass. 615, 618 (1994) (rejecting claim for equitable distribution of property where plaintiff cohabited with but did not marry defendant); *Feliciano* v. *Rosemar Silver Co.*, 401 Mass. 141, 142 (1987) (government interest in promoting marriage would be "subverted" by recognition of "a right to recover for loss of consortium by a person who has not accepted the correlative responsibilities of marriage"); *Davis* v. *Misiano*, 373 Mass. 261, 263 (1977) (unmarried partners not entitled to rights of separate support or alimony). See generally *Attorney Gen.* v. *Desilets*, 418 Mass. 316, 327-328 & nn.10, 11 (1994).

The benefits accessible only by way of a marriage license are enormous, touching nearly every aspect of life and death. The department states that "hundreds of statutes" are related to marriage and to marital benefits. With no attempt to be comprehensive, we note that some of the statutory benefits conferred by the Legislature on those who enter into civil marriage include, as to property: joint Massachusetts income tax filing (G. L. c. 62C, § 6); tenancy by the entirety (a form of ownership that provides certain protections against creditors and allows for the automatic descent of property to the surviving spouse without probate) (G. L. c. 184, § 7); extension of the benefit of the homestead protection (securing up to $300,000 in equity from creditors) to one's spouse and children (G. L. c. 188, § 1); automatic rights to inherit the property of a deceased spouse who does not leave a will (G. L. c. 190, § 1); the rights of elective share and of dower (which allow surviving spouses certain property rights where the decedent spouse has not made adequate provision for the survivor in a will) (G. L. c. 191,

G. L. c. 208, § 34 (providing for payment of alimony and the equitable division of property on divorce); G. L. c. 191, § 15, and G. L. c. 189 (rights of elective share and dower).

§ 15, and G. L. c. 189); entitlement to wages owed to a deceased employee (G. L. c. 149, § 178A [general] and G. L. c. 149, § 178C [public employees]); eligibility to continue certain businesses of a deceased spouse (e.g., G. L. c. 112, § 53 [dentist]); the right to share the medical policy of one's spouse (e.g., G. L. c. 175, § 108, Second [*a*] [3] [defining insured's "dependent" to include one's spouse), see *Connors* v. *Boston*, 430 Mass. 31, 43 (1999) [domestic partners of city employees not included within term "dependent" as used in G. L. c. 32B, § 2]); thirty-nine week continuation of health coverage for the spouse of a person who is laid off or dies (e.g., G. L. c. 175, § 110G); preferential options under the Commonwealth's pension system (see G. L. c. 32, § 12 [2] ["Joint and Last Survivor Allowance"]); preferential benefits in the Commonwealth's medical program, MassHealth (e.g., 130 Code Mass. Regs. § 515.012 [A], prohibiting placing lien on long-term care patient's former home if spouse still lives there); access to veterans' spousal benefits and preferences (e.g., G. L. c. 115, § 1 [defining "dependents"] and G. L. c. 31, § 26 [State employment] and § 28 [municipal employees]); financial protections for spouses of certain Commonwealth employees (fire fighters, police officers, and prosecutors, among others) killed in the performance of duty (e.g., G. L. c. 32, §§ 100-103); the equitable division of marital property on divorce (G. L. c. 208, § 34); temporary and permanent alimony rights (G. L. c. 208, §§ 17 and 34); the right to separate support on separation of the parties that does not result in divorce (G. L. c. 209, § 32); and the right to bring claims for wrongful death and loss of consortium, and for funeral and burial expenses and punitive damages resulting from tort actions (G. L. c. 229, §§ 1 and 2; G. L. c. 228, § 1. See *Feliciano* v. *Rosemar Silver Co.*, *supra*).

Exclusive marital benefits that are not directly tied to property rights include the presumptions of legitimacy and parentage of children born to a married couple (G. L. c. 209C, § 6, and G. L. c. 46, § 4B); and evidentiary rights, such as the prohibition against spouses testifying against one another about their private conversations, applicable in both civil and criminal cases (G. L. c. 233, § 20). Other statutory benefits of a personal nature available only to married individuals include qualification for

bereavement or medical leave to care for individuals related by blood or marriage (G. L. c. 149, § 52D); an automatic "family member" preference to make medical decisions for an incompetent or disabled spouse who does not have a contrary health care proxy, see *Shine* v. *Vega*, 429 Mass. 456, 466 (1999); the application of predictable rules of child custody, visitation, support, and removal out-of-State when married parents divorce (e.g., G. L. c. 208, § 19 [temporary custody], § 20 [temporary support], § 28 [custody and support on judgment of divorce], § 30 [removal from Commonwealth], and § 31 [shared custody plan]; priority rights to administer the estate of a deceased spouse who dies without a will, and the requirement that a surviving spouse must consent to the appointment of any other person as administrator (G. L. c. 38, § 13 [disposition of body], and G. L. c. 113, § 8 [anatomical gifts]); and the right to interment in the lot or tomb owned by one's deceased spouse (G. L. c. 114, §§ 29-33).

Where a married couple has children, their children are also directly or indirectly, but no less auspiciously, the recipients of the special legal and economic protections obtained by civil marriage. Notwithstanding the Commonwealth's strong public policy to abolish legal distinctions between marital and nonmarital children in providing for the support and care of minors, see *Department of Revenue* v. *Mason M.*, 439 Mass. 665 (2003); *Woodward* v. *Commissioner of Social Sec.*, 435 Mass. 536, 546 (2002), the fact remains that marital children reap a measure of family stability and economic security based on their parents' legally privileged status that is largely inaccessible, or not as readily accessible, to nonmarital children. Some of these benefits are social, such as the enhanced approval that still attends the status of being a marital child. Others are material, such as the greater ease of access to family-based State and Federal benefits that attend the presumptions of one's parentage.

It is undoubtedly for these concrete reasons, as well as for its intimately personal significance, that civil marriage has long been termed a "civil right." See, e.g., *Loving* v. *Virginia*, 388 U.S. 1, 12 (1967) ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival"), quoting *Skinner* v. *Oklahoma*, 316 U.S. 535, 541 (1942); *Milford* v.

*Worcester*, 7 Mass. 48, 56 (1810) (referring to "civil rights incident to marriages"). See also *Baehr* v. *Lewin*, 74 Haw. 530, 561 (1993) (identifying marriage as "civil right[ ]"); *Baker* v. *State*, 170 Vt. 194, 242 (1999) (Johnson, J., concurring in part and dissenting in part) (same). The United States Supreme Court has described the right to marry as "of fundamental importance for all individuals" and as "part of the fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause." *Zablocki* v. *Redhail*, 434 U.S. 374, 384 (1978). See *Loving* v. *Virginia, supra* ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men").[14]

Without the right to marry — or more properly, the right to choose to marry — one is excluded from the full range of human experience and denied full protection of the laws for one's "avowed commitment to an intimate and lasting human relationship." *Baker* v. *State, supra* at 229. Because civil marriage is central to the lives of individuals and the welfare of the community, our laws assiduously protect the individual's right to marry against undue government incursion. Laws may not "interfere directly and substantially with the right to marry." *Zablocki* v. *Redhail, supra* at 387. See *Perez* v. *Sharp*, 32 Cal. 2d 711, 714 (1948) ("There can be no prohibition of marriage except for an important social objective and reasonable means").[15]

Unquestionably, the regulatory power of the Commonwealth

---

[14]Civil marriage enjoys a dual and in some sense paradoxical status as both a State-conferred benefit (with its attendant obligations) and a multi-faceted personal interest of "fundamental importance." *Zablocki* v. *Redhail*, 434 U.S. 376, 383 (1978). As a practical matter, the State could not abolish civil marriage without chaotic consequences. The "right to marry," *id.* at 387, is different from rights deemed "fundamental" for equal protection and due process purposes because the State could, in theory, abolish all civil marriage while it cannot, for example, abolish all private property rights.

[15]The department argues that this case concerns the rights of couples (same-sex and opposite-sex), not the rights of individuals. This is incorrect. The rights implicated in this case are at the core of individual privacy and autonomy. See, e.g., *Loving* v. *Virginia*, 388 U.S. 1, 12 (1967) ("Under our Constitution, the freedom to marry or not marry, a person of another race resides with the individual and cannot be infringed by the State"); *Perez* v. *Sharp*, 32 Cal. 2d 711, 716 (1948) ("The right to marry is the right of individuals, not of racial groups"). See also *A.Z.* v. *B.Z.*, 431 Mass. 150, 162 (2000),

over civil marriage is broad, as is the Commonwealth's discretion to award public benefits. See *Commonwealth* v. *Stowell,* 389 Mass. 171, 175 (1983) (marriage); *Moe* v. *Secretary of Admin. & Fin.,* 382 Mass. 629, 652 (1981) (Medicaid benefits). Individuals who have the choice to marry each other and nevertheless choose not to may properly be denied the legal benefits of marriage. See *Wilcox* v. *Trautz,* 427 Mass. 326, 334 (1998); *Collins* v. *Guggenheim,* 417 Mass. 615, 618 (1994); *Feliciano* v. *Rosemar Silver Co.,* 401 Mass. 141, 142 (1987). But that same logic cannot hold for a qualified individual who would marry if she or he only could.

B

For decades, indeed centuries, in much of this country (including Massachusetts) no lawful marriage was possible between white and black Americans. That long history availed not when the Supreme Court of California held in 1948 that a legislative prohibition against interracial marriage violated the due process and equality guarantees of the Fourteenth Amendment, *Perez* v. *Sharp,* 32 Cal. 2d 711, 728 (1948), or when, nineteen years later, the United States Supreme Court also held that a statutory bar to interracial marriage violated the Fourteenth Amendment, *Loving* v. *Virginia,* 388 U.S. 1 (1967).[16] As both *Perez* and *Loving* make clear, the right to marry means

---

quoting *Moore* v. *East Cleveland,* 431 U.S. 494, 499 (1977) (noting "freedom of personal choice in matters of marriage and family life"). While two individuals who wish to marry may be equally aggrieved by State action denying them that opportunity, they do not "share" the liberty and equality interests at stake.

[16]The department argues that the *Loving* decision did not profoundly alter the by-then common conception of marriage because it was decided at a time when antimiscegenation statutes were in "full-scale retreat." But the relationship the department draws between popular consensus and the constitutionality of a statute oppressive to a minority group ignores the successful constitutional challenges to an antimiscegenation statute, initiated some twenty years earlier. When the Supreme Court of California decided *Perez* v. *Sharp,* 32 Cal. 2d 711, 728 (1948), a precursor to *Loving,* racial inequality was rampant and normative, segregation in public and private institutions was commonplace, the civil rights movement had not yet been launched, and the "separate but equal" doctrine of *Plessy* v. *Ferguson,* 163 U.S. 537 (1896), was still good law. The lack of popular consensus favoring integration (including interracial marriage) did not deter the Supreme Court of California from holding that that State's antimiscegenation statute violated the plaintiffs'

little if it does not include the right to marry the person of one's choice, subject to appropriate government restrictions in the interests of public health, safety, and welfare. See *Perez* v. *Sharp, supra* at 717 ("the essence of the right to marry is freedom to join in marriage with the person of one's choice"). See also *Loving* v. *Virginia, supra* at 12. In this case, as in *Perez* and *Loving,* a statute deprives individuals of access to an institution of fundamental legal, personal, and social significance — the institution of marriage — because of a single trait: skin color in *Perez* and *Loving,* sexual orientation here. As it did in *Perez* and *Loving,* history must yield to a more fully developed understanding of the invidious quality of the discrimination.[17]

The Massachusetts Constitution protects matters of personal liberty against government incursion as zealously, and often more so, than does the Federal Constitution, even where both Constitutions employ essentially the same language. See *Planned Parenthood League of Mass., Inc.* v. *Attorney Gen.,* 424 Mass. 586, 590 (1997); *Corning Glass Works* v. *Ann & Hope, Inc. of Danvers,* 363 Mass. 409, 416 (1973). That the Massachusetts Constitution is in some instances more protective of individual liberty interests than is the Federal Constitution is not surprising. Fundamental to the vigor of our Federal system of government is that "state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Arizona* v. *Evans,* 514 U.S. 1, 8 (1995).[18]

The individual liberty and equality safeguards of the Mas-

_____

constitutional rights. Neither the *Perez* court nor the *Loving* Court was content to permit an unconstitutional situation to fester because the remedy might not reflect a broad social consensus.

[17]Recently, the United States Supreme Court has reaffirmed that the Constitution prohibits a State from wielding its formidable power to regulate conduct in a manner that demeans basic human dignity, even though that statutory discrimination may enjoy broad public support. The Court struck down a statute criminalizing sodomy. See *Lawrence, supra* at 2478 ("The liberty protected by the Constitution allows homosexual persons the right to make this choice").

[18]We have recognized that our Constitution may more extensively protect individual rights than the Federal Constitution in widely different contexts. See, e.g., *Horsemen's Benevolent & Protective Ass'n* v. *State Racing Comm'n,* 403 Mass. 692 (1989) (freedom from intrusive drug testing in highly regulated industry); *Cepulonis* v. *Secretary of the Commonwealth,* 389 Mass. 930 (1983)

sachusetts Constitution protect both "freedom from" unwarranted government intrusion into protected spheres of life and "freedom to" partake in benefits created by the State for the common good. See *Bachrach* v. *Secretary of the Commonwealth*, 382 Mass. 268, 273 (1981); *Dalli* v. *Board of Educ.*, 358 Mass. 753, 759 (1971). Both freedoms are involved here. Whether and whom to marry, how to express sexual intimacy, and whether and how to establish a family — these are among the most basic of every individual's liberty and due process rights. See, e.g., *Lawrence, supra* at 2481; *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 851 (1992); *Zablocki* v. *Redhail*, 434 U.S. 374, 384 (1978); *Roe* v. *Wade*, 410 U.S. 113, 152-153 (1973); *Eisenstadt* v. *Baird*, 405 U.S. 438, 453 (1972); *Loving* v. *Virginia, supra.* And central to personal freedom and security is the assurance that the laws will apply equally to persons in similar situations. "Absolute equality before the law is a fundamental principle of our own Constitution." *Opinion of the Justices*, 211 Mass. 618, 619 (1912). The liberty interest in choosing whether and whom to marry would be hollow if the Commonwealth could, without sufficient justification, foreclose an individual from freely choosing the person with whom to share an exclusive commitment in the unique institution of civil marriage.

The Massachusetts Constitution requires, at a minimum, that the exercise of the State's regulatory authority not be "arbitrary or capricious." *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 542 (1974).[19] Under both the equality and liberty guarantees, regulatory authority must, at very least, serve "a

(inmates' right to register to vote); *Batchelder* v. *Allied Stores Int'l, Inc.*, 388 Mass. 83 (1983) (freedom to solicit signatures for ballot access in public election); *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629 (1981) (right to State Medicaid payment for medically necessary abortions); *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health*, 348 Mass. 414 (1965) (freedom to pursue one's lawful business).

[19]The Massachusetts Constitution empowers the General Court to enact only those orders, laws, statutes, and ordinances "wholesome and reasonable," that are not "repugnant or contrary" to the Constitution, and that, in the Legislature's judgment, advance the "good and welfare" of the Commonwealth, its government, and all of its subjects. Part II, c. 1, § 1, art. 4. See *Opinion of the Justices*, 360 Mass. 877, 883 (1971), quoting *Jones* v. *Robbins*, 8 Gray 329, 343 (1857) (powers vested in government are set down in Massachusetts Constitution "in a few plain, clear and intelligible

legitimate purpose in a rational way"; a statute must "bear a reasonable relation to a permissible legislative objective." *Rushworth* v. *Registrar of Motor Vehicles*, 413 Mass. 265, 270 (1992). See, e.g., *Massachusetts Fed'n of Teachers* v. *Board of Educ.*, 436 Mass. 763, 778 (2002) (equal protection); *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health*, 348 Mass. 414, 422 (1965) (due process). Any law failing to satisfy the basic standards of rationality is void.

The plaintiffs challenge the marriage statute on both equal protection and due process grounds. With respect to each such claim, we must first determine the appropriate standard of review. Where a statute implicates a fundamental right or uses a suspect classification, we employ "strict judicial scrutiny." *Lowell* v. *Kowalski*, 380 Mass. 663, 666 (1980). For all other statutes, we employ the " 'rational basis' test." *English* v. *New England Med. Ctr.*, 405 Mass. 423, 428 (1989). For due process claims, rational basis analysis requires that statutes "bear[] a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare." *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health, supra*, quoting *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life*, 307 Mass. 408, 418 (1940). For equal protection challenges, the rational basis test requires that "an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class." *English* v. *New England Med. Ctr., supra* at 429, quoting *Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 452 (1985) (Stevens, J., concurring).[20]

The department argues that no fundamental right or "suspect"

propositions, for the better guidance and control, both of legislators and magistrates").

[20]Not every asserted rational relationship is a "conceivable" one, and rationality review is not "toothless." *Murphy* v. *Commissioner of the Dep't of Indus. Accs.*, 415 Mass. 218, 233 (1993), citing *Mathews* v. *Lucas*, 427 U.S. 495, 510 (1976). Statutes have failed rational basis review even in circumstances where no fundamental right or "suspect" classification is implicated. See, e.g., *Murphy* v. *Commissioner of the Dep't of Indus. Accs.*, 415 Mass. 218, 226-227 (1993) (fee imposed on retention of counsel in administrative proceedings); *Secretary of the Commonwealth* v. *City Clerk of Lowell*, 373 Mass. 178, 186 (1977) (selection of surname for nonmarital

class is at issue here,[21] and rational basis is the appropriate standard of review. For the reasons we explain below, we conclude that the marriage ban does not meet the rational basis test for either due process or equal protection. Because the statute does not survive rational basis review, we do not consider the plaintiffs' arguments that this case merits strict judicial scrutiny.

The department posits three legislative rationales for prohibiting same-sex couples from marrying: (1) providing a "favorable setting for procreation"; (2) ensuring the optimal setting for child rearing, which the department defines as "a two-parent family with one parent of each sex"; and (3) preserving scarce State and private financial resources. We consider each in turn.

The judge in the Superior Court endorsed the first rationale, holding that "the state's interest in regulating marriage is based on the traditional concept that marriage's primary purpose is procreation." This is incorrect. Our laws of civil marriage do not privilege procreative heterosexual intercourse between married people above every other form of adult intimacy and every other means of creating a family. General Laws c. 207 contains no requirement that the applicants for a marriage license attest to their ability or intention to conceive children by coitus. Fertility is not a condition of marriage, nor is it grounds for divorce. People who have never consummated their marriage, and never plan to, may be and stay married. See *Franklin* v. *Franklin*, 154 Mass. 515, 516 (1891) ("The consummation of a marriage by

child); *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.*, 358 Mass. 272, 280-281 (1970) (automobile insurance ratesetting); *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health*, 348 Mass. 414, 422 (1965) (sale of wholesome product); *Mansfield Beauty Academy, Inc.* v. *Board of Registration of Hairdressers*, 326 Mass. 624, 627 (1951) (right to charge for materials furnished to models by trade school); *Opinion of the Justices*, 322 Mass. 755, 760-761 (1948) (proposed statute concerning regulating cemeteries); *Boston Elevated Ry.* v. *Commonwealth*, 310 Mass. 528, 556-557 (1942) (legislation impairing contract right); *Durgin* v. *Minot*, 203 Mass. 26, 28 (1909) (statute authorizing certain board of health regulations).

[21]Article 1 of the Massachusetts Constitution specifically prohibits sex-based discrimination. See *post* at 344-345 (Greaney, J., concurring). We have not previously considered whether "sexual orientation" is a "suspect" classification. Our resolution of this case does not require that inquiry here.

coition is not necessary to its validity").[22] People who cannot stir from their deathbed may marry. See G. L. c. 207, § 28A. While it is certainly true that many, perhaps most, married couples have children together (assisted or unassisted), it is the exclusive and permanent commitment of the marriage partners to one another, not the begetting of children, that is the sine qua non of civil marriage.[23]

Moreover, the Commonwealth affirmatively facilitates bringing children into a family regardless of whether the intended parent is married or unmarried, whether the child is adopted or born into a family, whether assistive technology was used to conceive the child, and whether the parent or her partner is

[22]Our marriage law does recognize that the inability to participate in intimate relations may have a bearing on one of the central expectations of marriage. Since the earliest days of the Commonwealth, the divorce statutes have permitted (but not required) a spouse to choose to divorce his or her impotent mate. See St. 1785, c. 69, § 3. While infertility is not a ground to void or terminate a marriage, impotency (the inability to engage in sexual intercourse) is, at the election of the disaffected spouse. See G. L. c. 207, § 14 (annulment); G. L. c. 208, § 1 (divorce). Cf. Martin v. Otis, 233 Mass. 491, 495 (1919) ("impotency does not render a marriage void, but only voidable at the suit of the party conceiving himself or herself to be wronged"); Smith v. Smith, 171 Mass. 404, 408 (1898) (marriage nullified because husband's incurable syphilis "leaves him no foundation on which the marriage relation could properly rest"). See also G. L. c. 207, § 28A. However, in Hanson v. Hanson, 287 Mass. 154 (1934), a decree of annulment for nonconsummation was reversed where the wife knew before the marriage that her husband had syphilis and voluntarily chose to marry him. We held that, given the circumstances of the wife's prior knowledge of the full extent of the disease and her consent to be married, the husband's condition did not go "to the essence" of the marriage. Id. at 159.

[23]It is hardly surprising that civil marriage developed historically as a means to regulate heterosexual conduct and to promote child rearing, because until very recently unassisted heterosexual relations were the only means short of adoption by which children could come into the world, and the absence of widely available and effective contraceptives made the link between heterosexual sex and procreation very strong indeed. Punitive notions of illegitimacy, see Powers v. Wilkinson, 399 Mass. 650, 661 (1987), and of homosexual identity, see Lawrence, supra at 2478-2479, further cemented the common and legal understanding of marriage as an unquestionably heterosexual institution. But it is circular reasoning, not analysis, to maintain that marriage must remain a heterosexual institution because that is what it historically has been. As one dissent acknowledges, in "the modern age," "heterosexual intercourse, procreation, and child care are not necessarily conjoined." Post at 382 (Cordy, J., dissenting).

heterosexual, homosexual, or bisexual.[24] If procreation were a necessary component of civil marriage, our statutes would draw a tighter circle around the permissible bounds of nonmarital child bearing and the creation of families by noncoital means. The attempt to isolate procreation as "the source of a fundamental right to marry," *post* at 370 (Cordy, J., dissenting), overlooks the integrated way in which courts have examined the complex and overlapping realms of personal autonomy, marriage, family life, and child rearing. Our jurisprudence recognizes that, in these nuanced and fundamentally private areas of life, such a narrow focus is inappropriate.

The "marriage is procreation" argument singles out the one unbridgeable difference between same-sex and opposite-sex couples, and transforms that difference into the essence of legal marriage. Like "Amendment 2" to the Constitution of Colorado, which effectively denied homosexual persons equality under the law and full access to the political process, the marriage restriction impermissibly "identifies persons by a single trait and then denies them protection across the board." *Romer* v. *Evans*, 517 U.S. 620, 633 (1996). In so doing, the State's action confers an official stamp of approval on the destructive stereotype that same-sex relationships are inherently unstable and inferior to opposite-sex relationships and are not worthy of respect.[25]

The department's first stated rationale, equating marriage with unassisted heterosexual procreation, shades imperceptibly into its second: that confining marriage to opposite-sex couples ensures that children are raised in the "optimal" setting. Protect-

---

[24]Adoption and certain insurance coverage for assisted reproductive technology are available to married couples, same-sex couples, and single individuals alike. See G. L. c. 210, § 1; *Adoption of Tammy*, 416 Mass. 205 (1993) (adoption); G. L. c. 175, § 47H; G. L. c. 176A, § 8K; G. L. c. 176B, § 4J; and G. L. c. 176G, § 4 (insurance coverage). See also *Woodward* v. *Commissioner of Social Sec.*, 435 Mass. 536, 546 (2002) (posthumous reproduction); *Culliton* v. *Beth Israel Deaconness Med. Ctr.*, 435 Mass. 285, 293 (2001) (gestational surrogacy).

[25]Because our laws expressly or implicitly sanction so many kinds of opposite-sex marriages that do not or will never result in unassisted reproduction, it is erroneous to claim, as the dissent does, that the "theoretical[]" procreative capacity of opposite-sex couples, *post* at 391 (Cordy, J., dissenting), sufficiently justifies excluding from civil marriage same-sex couples who actually have children.

ing the welfare of children is a paramount State policy. Restricting marriage to opposite-sex couples, however, cannot plausibly further this policy. "The demographic changes of the past century make it difficult to speak of an average American family. The composition of families varies greatly from household to household." *Troxel* v. *Granville*, 530 U.S. 57, 63 (2000). Massachusetts has responded supportively to "the changing realities of the American family," *id.* at 64, and has moved vigorously to strengthen the modern family in its many variations. See, e.g., G. L. c. 209C (paternity statute); G. L. c. 119, § 39D (grandparent visitation statute); *Blixt* v. *Blixt*, 437 Mass. 649 (2002), cert. denied, 537 U.S. 1189 (2003) (same); *E.N.O.* v. *L.M.M.*, 429 Mass. 824, cert. denied, 528 U.S. 1005 (1999) (de facto parent); *Youmans* v. *Ramos*, 429 Mass. 774, 782 (1999) (same); and *Adoption of Tammy*, 416 Mass. 205 (1993) (coparent adoption). Moreover, we have repudiated the common-law power of the State to provide varying levels of protection to children based on the circumstances of birth. See G. L. c. 209C (paternity statute); *Powers* v. *Wilkinson*, 399 Mass. 650, 661 (1987) ("Ours is an era in which logic and compassion have impelled the law toward unburdening children from the stigma and the disadvantages heretofore attendant upon the status of illegitimacy"). The "best interests of the child" standard does not turn on a parent's sexual orientation or marital status. See e.g., *Doe* v. *Doe*, 16 Mass. App. Ct. 499, 503 (1983) (parent's sexual orientation insufficient ground to deny custody of child in divorce action). See also *E.N.O.* v. *L.M.M.*, *supra* at 829-830 (best interests of child determined by considering child's relationship with biological and de facto same-sex parents); *Silvia* v. *Silvia*, 9 Mass. App. Ct. 339, 341 & n.3 (1980) (collecting support and custody statutes containing no gender distinction).

The department has offered no evidence that forbidding marriage to people of the same sex will increase the number of couples choosing to enter into opposite-sex marriages in order to have and raise children. There is thus no rational relationship between the marriage statute and the Commonwealth's proffered goal of protecting the "optimal" child rearing unit. Moreover, the department readily concedes that people in same-sex couples may be "excellent" parents. These couples (includ-

ing four of the plaintiff couples) have children for the reasons others do — to love them, to care for them, to nurture them. But the task of child rearing for same-sex couples is made infinitely harder by their status as outliers to the marriage laws. While establishing the parentage of children as soon as possible is crucial to the safety and welfare of children, see *Culliton* v. *Beth Israel Deaconness Med. Ctr.*, 435 Mass. 285, 292 (2001), same-sex couples must undergo the sometimes lengthy and intrusive process of second-parent adoption to establish their joint parentage. While the enhanced income provided by marital benefits is an important source of security and stability for married couples and their children, those benefits are denied to families headed by same-sex couples. See, e.g., note 6, *supra.* While the laws of divorce provide clear and reasonably predictable guidelines for child support, child custody, and property division on dissolution of a marriage, same-sex couples who dissolve their relationships find themselves and their children in the highly unpredictable terrain of equity jurisdiction. See *E.N.O.* v. *L.M.M.*, *supra.* Given the wide range of public benefits reserved only for married couples, we do not credit the department's contention that the absence of access to civil marriage amounts to little more than an inconvenience to same-sex couples and their children. Excluding same-sex couples from civil marriage will not make children of opposite-sex marriages more secure, but it does prevent children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of "a stable family structure in which children will be reared, educated, and socialized." *Post* at 381 (Cordy, J., dissenting).[26]

No one disputes that the plaintiff couples are families, that many are parents, and that the children they are raising, like all children, need and should have the fullest opportunity to grow up in a secure, protected family unit. Similarly, no one disputes that, under the rubric of marriage, the State provides a

---

[26]The claim that the constitutional rights to bear and raise a child are "not implicated or infringed" by the marriage ban, *post* at 371 (Cordy, J., dissenting), does not stand up to scrutiny. The absolute foreclosure of the marriage option for the class of parents and would-be parents at issue here imposes a heavy burden on their decision to have and raise children that is not suffered by any other class of parent.

cornucopia of substantial benefits to married parents and their children. The preferential treatment of civil marriage reflects the Legislature's conclusion that marriage "is the foremost setting for the education and socialization of children" precisely because it "encourages parents to remain committed to each other and to their children as they grow." *Post* at 383 (Cordy, J., dissenting).

In this case, we are confronted with an entire, sizeable class of parents raising children who have absolutely no access to civil marriage and its protections because they are forbidden from procuring a marriage license. It cannot be rational under our laws, and indeed it is not permitted, to penalize children by depriving them of State benefits because the State disapproves of their parents' sexual orientation.

The third rationale advanced by the department is that limiting marriage to opposite-sex couples furthers the Legislature's interest in conserving scarce State and private financial resources. The marriage restriction is rational, it argues, because the General Court logically could assume that same-sex couples are more financially independent than married couples and thus less needy of public marital benefits, such as tax advantages, or private marital benefits, such as employer-financed health plans that include spouses in their coverage.

An absolute statutory ban on same-sex marriage bears no rational relationship to the goal of economy. First, the department's conclusory generalization — that same-sex couples are less financially dependent on each other than opposite-sex couples — ignores that many same-sex couples, such as many of the plaintiffs in this case, have children and other dependents (here, aged parents) in their care.[27] The department does not contend, nor could it, that these dependents are less needy or deserving than the dependents of married couples. Second, Massachusetts marriage laws do not condition receipt of public and private financial benefits to married individuals on a demonstration of financial dependence on each other; the benefits are available to married couples regardless of whether

---

[27]It is also true that civil marriage creates legal dependency between spouses, which is simply not available to unmarried couples. See Part III A, *supra.*

they mingle their finances or actually depend on each other for support.

The department suggests additional rationales for prohibiting same-sex couples from marrying, which are developed by some amici. It argues that broadening civil marriage to include same-sex couples will trivialize or destroy the institution of marriage as it has historically been fashioned. Certainly our decision today marks a significant change in the definition of marriage as it has been inherited from the common law, and understood by many societies for centuries. But it does not disturb the fundamental value of marriage in our society.

Here, the plaintiffs seek only to be married, not to undermine the institution of civil marriage. They do not want marriage abolished. They do not attack the binary nature of marriage, the consanguinity provisions, or any of the other gate-keeping provisions of the marriage licensing law. Recognizing the right of an individual to marry a person of the same sex will not diminish the validity or dignity of opposite-sex marriage, any more than recognizing the right of an individual to marry a person of a different race devalues the marriage of a person who marries someone of her own race.[28] If anything, extending civil marriage to same-sex couples reinforces the importance of marriage to individuals and communities. That same-sex couples are willing to embrace marriage's solemn obligations of exclusivity, mutual support, and commitment to one another is a testament to the enduring place of marriage in our laws and in the human spirit.[29]

It has been argued that, due to the State's strong interest in

---

[28]Justice Cordy suggests that we have "transmuted the 'right' to marry into a right to change the institution of marriage itself," post at 365 (Cordy, J., dissenting), because marriage is intimately tied to the reproductive systems of the marriage partners and to the "optimal" mother and father setting for child rearing. Id. That analysis hews perilously close to the argument, long repudiated by the Legislature and the courts, that men and women are so innately and fundamentally different that their respective "proper spheres" can be rigidly and universally delineated. An abundance of legislative enactments and decisions of this court negate any such stereotypical premises.

[29]We are concerned only with the withholding of the benefits, protections, and obligations of civil marriage from a certain class of persons for invalid reasons. Our decision in no way limits the rights of individuals to refuse to

the institution of marriage as a stabilizing social structure, only the Legislature can control and define its boundaries. Accordingly, our elected representatives legitimately may choose to exclude same-sex couples from civil marriage in order to assure all citizens of the Commonwealth that (1) the benefits of our marriage laws are available explicitly to create and support a family setting that is, in the Legislature's view, optimal for child rearing, and (2) the State does not endorse gay and lesbian parenthood as the equivalent of being raised by one's married biological parents.[30] These arguments miss the point. The Massachusetts Constitution requires that legislation meet certain criteria and not extend beyond certain limits. It is the function of courts to determine whether these criteria are met and whether these limits are exceeded. In most instances, these limits are defined by whether a rational basis exists to conclude that legislation will bring about a rational result. The Legislature in the first instance, and the courts in the last instance, must ascertain whether such a rational basis exists. To label the court's role as usurping that of the Legislature, see, e.g., *post* at 394-395 (Cordy, J., dissenting), is to misunderstand the nature

marry persons of the same sex for religious or any other reasons. It in no way limits the personal freedom to disapprove of, or to encourage others to disapprove of, same-sex marriage. Our concern, rather, is whether historical, cultural, religious, or other reasons permit the State to impose limits on personal beliefs concerning whom a person should marry.

[30]Justice Cordy's dissenting opinion, *post* at 386-388 and nn.24-28 (Cordy, J., dissenting), makes much of the current "battle of the experts" concerning the possible long-term effects on children of being raised in households headed by same-sex parents. We presume that the Legislature is aware of these studies, see *Mutual Loan Co.* v. *Martell,* 200 Mass. 482, 487 (1909), aff'd, 222 U.S. 225 (1911), and has drawn the conclusion that a child's best interest is not harmed by being raised and nurtured by same-sex parents. See G. L. c. 210, § 7. See also *Adoption of Tammy,* 416 Mass. 205 (1993); 110 Code Mass. Regs. § 1.09 (3) (2000) ("The Department [of Social Services] shall not deny to any person the opportunity to become an adoptive or foster parent, on the basis of the . . . sexual orientation . . . of the person, or of the child, involved"). Either the Legislature's openness to same-sex parenting is rational in light of its paramount interests in promoting children's well-being, or irrational in light of its so-called conclusion that a household headed by opposite-sex married parents is the "optimal" setting for raising children. See *post* at 392 (Cordy, J., dissenting). We give full credit to the Legislature for enacting a statutory scheme of child-related laws that is coherent, consistent, and harmonious. See *New England Div. of the Am. Cancer Soc'y* v. *Commissioner of Admin.,* 437 Mass. 172, 180 (2002).

and purpose of judicial review. We owe great deference to the Legislature to decide social and policy issues, but it is the traditional and settled role of courts to decide constitutional issues.[31]

The history of constitutional law "is the story of the extension of constitutional rights and protections to people once ignored or excluded." *United States* v. *Virginia*, 518 U.S. 515, 557 (1996) (construing equal protection clause of Fourteenth Amendment to prohibit categorical exclusion of women from public military institute). This statement is as true in the area of civil marriage as in any other area of civil rights. See, e.g., *Turner* v. *Safley*, 482 U.S. 78 (1987); *Loving* v. *Virginia*, 388 U.S. 1 (1967); *Perez* v. *Sharp*, 32 Cal. 2d 711 (1948). As a public institution and a right of fundamental importance, civil marriage is an evolving paradigm. The common law was exceptionally harsh toward women who became wives: a woman's legal identity all but evaporated into that of her husband. See generally C.P. Kindregan, Jr., & M.L. Inker, Family Law and Practice §§ 1.9 and 1.10 (3d ed. 2002). Thus, one

---

[31]If total deference to the Legislature were the case, the judiciary would be stripped of its constitutional authority to decide challenges to statutes pertaining to marriage, child rearing, and family relationships, and, conceivably, unconstitutional laws that provided for the forced sterilization of habitual criminals; prohibited miscegenation; required court approval for the marriage of persons with child support obligations; compelled a pregnant unmarried minor to obtain the consent of both parents before undergoing an abortion; and made sodomy a criminal offense, to name just a few, would stand.

Indeed, every State court that has recently considered the issue we decide today has exercised its duty in the same way, by carefully scrutinizing the statutory ban òn same-sex marriages in light of relevant State constitutional provisions. See *Brause vs. Bureau of Vital Statistics*, No. 3AN-95-6562CJ (Alaska Super. Ct., Feb. 27, 1998) (concluding marriage statute violated right to privacy provision in Alaska Constitution) (superseded by constitutional amendment, art. I, § 25 of Constitution of Alaska); *Baehr* v. *Lewin*, 74 Haw. 530, 571-580 (1993) (concluding marriage statute implicated Hawaii Constitution's equal protection clause; remanding case to lower court for further proceedings); *Baker* v. *State*, 170 Vt. 194, 197-198 (1999) (concluding marriage statute violated Vermont Constitution's common benefits clause). But see *Standhardt* v. *Superior Court*, 77 P.3d 451 (Ariz. Ct. App. 2003) (marriage statute does not violate liberty interests under either Federal or Arizona Constitution). See also *Halpern* v. *Toronto (City)*, 172 O.A.C. 276 (2003) (concluding marriage statute violated equal protection provisions of Canada's Charter of Rights and Freedoms); *EGALE Canada, Inc.* v. *Canada (Attorney Gen.)*, 13 B.C.L.R. (4th) 1 (2003) (same).

early Nineteenth Century jurist could observe matter of factly that, prior to the abolition of slavery in Massachusetts, "the condition of a slave resembled the connection of a wife with her husband, and of infant children with their father. He is obliged to maintain them, and they cannot be separated from him." *Winchendon* v. *Hatfield*, 4 Mass. 123, 129 (1808). But since at least the middle of the Nineteenth Century, both the courts and the Legislature have acted to ameliorate the harshness of the common-law regime. In *Bradford* v. *Worcester*, 184 Mass. 557, 562 (1904), we refused to apply the common-law rule that the wife's legal residence was that of her husband to defeat her claim to a municipal "settlement of paupers." In *Lewis* v. *Lewis*, 370 Mass. 619, 629 (1976), we abrogated the common-law doctrine immunizing a husband against certain suits because the common-law rule was predicated on "antediluvian assumptions concerning the role and status of women in marriage and in society." *Id.* at 621. Alarms about the imminent erosion of the "natural" order of marriage were sounded over the demise of antimiscegenation laws, the expansion of the rights of married women, and the introduction of "no-fault" divorce.[32] Marriage has survived all of these transformations, and we have no doubt that marriage will continue to be a vibrant and revered institution.

We also reject the argument suggested by the department, and elaborated by some amici, that expanding the institution of civil marriage in Massachusetts to include same-sex couples will lead to interstate conflict. We would not presume to dictate how another State should respond to today's decision. But neither should considerations of comity prevent us from according Massachusetts residents the full measure of protection available under the Massachusetts Constitution. The genius of our Federal system is that each State's Constitution has vitality specific to

---

[32]One prominent historian of marriage notes, for example, that in the Nineteenth Century, the Reverend Theodore Woolsey led the charge against expanding the grounds for divorce, arguing that the "the only divinely approved (and therefore truly legitimate) reason for divorce was adultery" and that only the innocent party to a marriage terminated by reason of adultery be permitted to remarry. Cott, Public Vows: A History of Marriage and the Nation 106 (2000). See *id.* at 44-45, for a general discussion of resistance to the demise of antimiscegenation laws.

its own traditions, and that, subject to the minimum require-
ments of the Fourteenth Amendment, each State is free to ad-
dress difficult issues of individual liberty in the manner its own
Constitution demands.

Several amici suggest that prohibiting marriage by same-sex
couples reflects community consensus that homosexual conduct
is immoral. Yet Massachusetts has a strong affirmative policy of
preventing discrimination on the basis of sexual orientation. See
G. L. c. 151B (employment, housing, credit, services); G. L.
c. 265, § 39 (hate crimes); G. L. c. 272, § 98 (public accom-
modation); G. L. c. 76, § 5 (public education). See also, e.g.,
*Commonwealth* v. *Balthazar*, 366 Mass. 298 (1974) (decriminal-
ization of private consensual adult conduct); *Doe* v. *Doe*, 16
Mass. App. Ct. 499, 503 (1983) (custody to homosexual parent
not per se prohibited).

The department has had more than ample opportunity to
articulate a constitutionally adequate justification for limiting
civil marriage to opposite-sex unions. It has failed to do so. The
department has offered purported justifications for the civil mar-
riage restriction that are starkly at odds with the comprehensive
network of vigorous, gender-neutral laws promoting stable
families and the best interests of children. It has failed to
identify any relevant characteristic that would justify shutting
the door to civil marriage to a person who wishes to marry
someone of the same sex.

The marriage ban works a deep and scarring hardship on a
very real segment of the community for no rational reason. The
absence of any reasonable relationship between, on the one
hand, an absolute disqualification of same-sex couples who
wish to enter into civil marriage and, on the other, protection of
public health, safety, or general welfare, suggests that the mar-
riage restriction is rooted in persistent prejudices against persons
who are (or who are believed to be) homosexual.[33] "The
Constitution cannot control such prejudices but neither can it

---

[33]It is not dispositive, for purposes of our constitutional analysis, whether
the Legislature, at the time it incorporated the common-law definition of mar-
riage into the first marriage laws nearly three centuries ago, did so with the
intent of discriminating against or harming persons who wish to marry another
of the same sex. We are not required to impute an invidious intent to the
Legislature in determining that a statute of long standing has no applicability

tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore* v. *Sidoti*, 466 U.S. 429, 433 (1984) (construing Fourteenth Amendment). Limiting the protections, benefits, and obligations of civil marriage to opposite-sex couples violates the basic premises of individual liberty and equality under law protected by the Massachusetts Constitution.

## IV

We consider next the plaintiffs' request for relief. We preserve as much of the statute as may be preserved in the face of the successful constitutional challenge. See *Mayor of Boston* v. *Treasurer & Receiver Gen.*, 384 Mass. 718, 725 (1981); *Dalli* v. *Board of Educ.*, 358 Mass. 753, 759 (1971). See also G. L. c. 4, § 6, Eleventh.

Here, no one argues that striking down the marriage laws is an appropriate form of relief. Eliminating civil marriage would be wholly inconsistent with the Legislature's deep commitment to fostering stable families and would dismantle a vital organiz-

to present circumstances or violates the rights of individuals under the Massachusetts Constitution. That the Legislature may have intended what at the time of enactment was a perfectly reasonable form of discrimination — or a result not recognized as a form of discrimination — was not enough to salvage from later constitutional challenge laws burdening nonmarital children or denying women's equal partnership in marriage. See, e.g., *Trimble* v. *Gordon*, 430 U.S. 762 (1977) (nonmarital children); *Angelini* v. *OMD Corp.*, 410 Mass. 653, 662, 663 (1987) ("The traditional common law rules which discriminated against children born out of wedlock have been discarded" and "[w]e have recognized that placing additional burdens on [nonmarital] children is unfair because they are not responsible for their [status]"); *Silvia* v. *Silvia*, 9 Mass. App. Ct. 339, 340-341 (1980) (there now exists "a comprehensive statutory and common law pattern which places marital and parental obligations on both the husband and wife"). We are concerned with the operation of challenged laws on the parties before us, and we do not inhibit our inquiry on the ground that a statute's original enactors had a benign or at the time constitutionally unassailable purpose. See *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 557 (1979), quoting *Walz* v. *Tax Comm'n of the City of N.Y.*, 397 U.S. 664, 678 (1970) ("the mere fact that a certain practice has gone unchallenged for a long period of time cannot alone immunize it from constitutional invalidity, 'even when that span of time covers our entire national existence and indeed predates it' "); *Merit Oil Co.* v. *Director of Div. on the Necessaries of Life*, 319 Mass. 301, 305 (1946) (constitutional contours of State's regulatory authority coextensive "with the changing needs of society").

ing principle of our society.[34] We face a problem similar to one that recently confronted the Court of Appeal for Ontario, the highest court of that Canadian province, when it considered the constitutionality of the same-sex marriage ban under the Canadian Charter of Rights and Freedoms (Charter), part of Canada's Federal Constitution. See *Halpern* v. *Toronto (City)*, 172 O.A.C. 276 (2003). Canada, like the United States, adopted the common law of England that civil marriage is "the voluntary union for life of one man and one woman, to the exclusion of all others." *Id.* at par. (36), quoting *Hyde* v. *Hyde*, [1861-1873] All E.R. 175 (1866). In holding that the limitation of civil marriage to opposite-sex couples violated the Charter, the Court of Appeal refined the common-law meaning of marriage. We concur with this remedy, which is entirely consonant with established principles of jurisprudence empowering a court to refine a common-law principle in light of evolving constitutional standards. See *Powers* v. *Wilkinson*, 399 Mass. 650, 661-662 (1987) (reforming common-law rule of construction of "issue"); *Lewis* v. *Lewis*, 370 Mass. 619, 629 (1976) (abolishing common-law rule of certain interspousal immunity).

We construe civil marriage to mean the voluntary union of two persons as spouses, to the exclusion of all others. This reformulation redresses the plaintiffs' constitutional injury and furthers the aim of marriage to promote stable, exclusive relationships. It advances the two legitimate State interests the department has identified: providing a stable setting for child rearing and conserving State resources. It leaves intact the

---

[34]Similarly, no one argues that the restrictions on incestuous or polygamous marriages are so dependent on the marriage restriction that they too should fall if the marriage restriction falls. Nothing in our opinion today should be construed as relaxing or abrogating the consanguinity or polygamy prohibitions of our marriage laws. See G. L. c. 207, §§ 1, 2, and 4. Rather, the statutory provisions concerning consanguinity or polygamous marriages shall be construed in a gender neutral manner. See *Califano* v. *Westcott*, 443 U.S. 76, 92-93 (1979) (construing word "father" in unconstitutional, underinclusive provision to mean "parent"); *Browne's Case*, 322 Mass. 429, 430 (1948) (construing masculine pronoun "his" to include feminine pronoun "her"). See also G. L. c. 4, § 6, Fourth ("words of one gender may be construed to include the other gender and the neuter" unless such construction would be "inconsistent with the manifest intent of the law-making body or repugnant to the context of the same statute").

Legislature's broad discretion to regulate marriage. See *Commonwealth* v. *Stowell*, 389 Mass. 171, 175 (1983).

In their complaint the plaintiffs request only a declaration that their exclusion and the exclusion of other qualified same-sex couples from access to civil marriage violates Massachusetts law. We declare that barring an individual from the protections, benefits, and obligations of civil marriage solely because that person would marry a person of the same sex violates the Massachusetts Constitution. We vacate the summary judgment for the department. We remand this case to the Superior Court for entry of judgment consistent with this opinion. Entry of judgment shall be stayed for 180 days to permit the Legislature to take such action as it may deem appropriate in light of this opinion. See, e.g., *Michaud* v. *Sheriff of Essex County*, 390 Mass. 523, 535-536 (1983).

*So ordered.*

GREANEY, J. (concurring). I agree with the result reached by the court, the remedy ordered, and much of the reasoning in the court's opinion. In my view, however, the case is more directly resolved using traditional equal protection analysis.

(a) Article 1 of the Declaration of Rights, as amended by art. 106 of the Amendments to the Massachusetts Constitution, provides:

> "All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

This provision, even prior to its amendment, guaranteed to all people in the Commonwealth — equally — the enjoyment of rights that are deemed important or fundamental. The withholding of relief from the plaintiffs, who wish to marry, and are

otherwise eligible to marry, on the ground that the couples are of the same gender, constitutes a categorical restriction of a fundamental right. The restriction creates a straightforward case of discrimination that disqualifies an entire group of our citizens and their families from participation in an institution of paramount legal and social importance. This is impermissible under art. 1.

Analysis begins with the indisputable premise that the deprivation suffered by the plaintiffs is no mere legal inconvenience. The right to marry is not a privilege conferred by the State, but a fundamental right that is protected against unwarranted State interference. See *Zablocki* v. *Redhail*, 434 U.S. 374, 384 (1978) ("the right to marry is of fundamental importance for all individuals"); *Loving* v. *Virginia*, 388 U.S. 1, 12 (1967) (freedom to marry is "one of the vital personal rights essential to the orderly pursuit of happiness by free men" under due process clause of Fourteenth Amendment); *Skinner* v. *Oklahoma*, 316 U.S. 535, 541 (1942) (marriage is one of "basic civil rights of man"). See also *Turner* v. *Safley*, 482 U.S. 78, 95-96 (1987) (prisoners' right to marry is constitutionally protected). This right is essentially vitiated if one is denied the right to marry a person of one's choice. See *Zablocki* v. *Redhail*, *supra* at 384 (all recent decisions of United States Supreme Court place "the decision to marry as among the personal decisions protected by the right of privacy").[1]

Because our marriage statutes intend, and state, the ordinary understanding that marriage under our law consists only of a union between a man and a woman, they create a statutory classification based on the sex of the two people who wish to marry. See *Baehr* v. *Lewin*, 74 Haw. 530, 564 (1993) (plurality opinion) (Hawaii marriage statutes created sex-based classification); *Baker* v. *State*, 170 Vt. 194, 253 (1999) (Johnson, J., concurring in part and dissenting in part) (same). That the classification is

---

[1] It makes no difference that the referenced decisions consider the right to marry in the context of the Fourteenth Amendment to the United States Constitution rather than in the context of our Constitution. As explained by the court, *ante* at 328 n.18, a fundamental right under the Federal Constitution enjoys at least a comparable measure of protection under our State Constitution. See *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629, 651 (1981).

sex based is self-evident. The marriage statutes prohibit some applicants, such as the plaintiffs, from obtaining a marriage license, and that prohibition is based solely on the applicants' gender. As a factual matter, an individual's choice of marital partner is constrained because of his or her own sex. Stated in particular terms, Hillary Goodridge cannot marry Julie Goodridge because she (Hillary) is a woman. Likewise, Gary Chalmers cannot marry Richard Linnell because he (Gary) is a man. Only their gender prevents Hillary and Gary from marrying their chosen partners under the present law.[2]

A classification may be gender based whether or not the challenged government action apportions benefits or burdens uniformly along gender lines. This is so because constitutional protections extend to individuals and not to categories of people. Thus, when an individual desires to marry, but cannot marry his or her chosen partner because of the traditional opposite-sex restriction, a violation of art. 1 has occurred. See *Commonwealth v. Chou*, 433 Mass. 229, 237-238 (2001) (assuming statute enforceable only across gender lines may offend Massachusetts equal rights amendment). I find it disingenuous, at best, to suggest that such an individual's right to marry has not been burdened at all, because he or she remains free to chose another partner, who is of the opposite sex.

The equal protection infirmity at work here is strikingly similar to (although, perhaps, more subtle than) the invidious discrimination perpetuated by Virginia's antimiscegenation laws

---

[2]In her separate opinion in *Baker* v. *State*, 170 Vt. 194, 253 (1999) (Johnson, J., concurring in part and dissenting in part), Justice Johnson described the equal protection defect in Vermont's marriage statutes in a slightly different, but no less persuasive, fashion:

"A woman is denied the right to marry another woman because her would-be partner is a woman, not because one or both are lesbians. Similarly, a man is denied the right to marry another man because his would-be partner is a man, not because one or both are gay. Thus, an individual's right to marry a person of the same sex is prohibited solely on the basis of sex, not on the basis of sexual orientation. Indeed, sexual orientation does not appear as a qualification for marriage under the marriage statutes. The State makes no inquiry into the sexual practices or identities of a couple seeking a license."

and unveiled in the decision of *Loving* v. *Virginia, supra*. In its landmark decision striking down Virginia's ban on marriages between Caucasians and members of any other race on both equal protection and substantive due process grounds, the United States Supreme Court soundly rejected the proposition that the equal application of the ban (i.e., that it applied equally to whites and blacks) made unnecessary the strict scrutiny analysis traditionally required of statutes drawing classifications according to race, see *id.* at 8-9, and concluded that "restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause." *Id.* at 12. That our marriage laws, unlike antimiscegenation laws, were not enacted purposely to discriminate in no way neutralizes their present discriminatory character.

With these two propositions established (the infringement on a fundamental right and a sex-based classification), the enforcement of the marriage statutes as they are currently understood is forbidden by our Constitution unless the State can present a compelling purpose furthered by the statutes that can be accomplished in no other reasonable manner.[3] See *Blixt* v. *Blixt*, 437 Mass. 649, 655-656 (2002), cert. denied, 537 U.S. 1189 (2003); *Lowell* v. *Kowalski*, 380 Mass. 663, 667-669 (1980). This the State has not done. The justifications put forth by the State to sustain the statute's exclusion of the plaintiffs are insufficient for the reasons explained by the court, to which I add the following observations.

The rights of couples to have children, to adopt, and to be foster parents, regardless of sexual orientation and marital status, are firmly established. See *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 829, cert. denied, 528 U.S. 1005 (1999); *Adoption of Tammy*, 416 Mass. 205, 210-211 (1993). As recognized in the court's opinion, and demonstrated by the record in this case, however,

---

[3]Some might say that the use of the so-called strict scrutiny formula is too facile in the sense that, once a court focuses on the formula as a dispositional tool, the result is automatically preordained — the statute will fail because the State cannot possibly sustain its heavy burden to overcome the presumption of arbitrary and invidious discrimination. This is not so. See, e.g., *Blixt* v. *Blixt*, 437 Mass. 649, 656-657 (2002), cert. denied, 537 U.S. 1189 (2003) (concluding G. L. c. 119, § 39D, grandparent visitation statute, furthered compelling State interest in mitigating potential harm to children in nonintact families).

the State's refusal to accord legal recognition to unions of same-sex couples has had the effect of creating a system in which children of same-sex couples are unable to partake of legal protections and social benefits taken for granted by children in families whose parents are of the opposite sex. The continued maintenance of this caste-like system is irreconcilable with, indeed, totally repugnant to, the State's strong interest in the welfare of all children and its primary focus, in the context of family law where children are concerned, on "the best interests of the child." The issue at stake is not one, as might ordinarily be the case, that can be unilaterally and totally deferred to the wisdom of the Legislature. "While the State retains wide latitude to decide the manner in which it will allocate benefits, it may not use criteria which discriminatorily burden the exercise of a fundamental right." *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629, 652 (1981). Nor can the State's wish to conserve resources be accomplished by invidious distinctions between classes of citizens. See *Plyler* v. *Doe*, 457 U.S. 202, 216-217, 227 (1982).[4]

A comment is in order with respect to the insistence of some that marriage is, as a matter of definition, the legal union of a man and a woman. To define the institution of marriage by the characteristics of those to whom it always has been accessible, in order to justify the exclusion of those to whom it never has been accessible, is conclusory and bypasses the core question we are asked to decide.[5] This case calls for a higher level of legal analysis. Precisely, the case requires that we confront ingrained assumptions with respect to historically accepted roles of men and women within the institution of marriage and requires that we reexamine these assumptions in light of the

[4]The argument, made by some in the case, that legalization of same-sex marriage in Massachusetts will be used by persons in other States as a tool to obtain recognition of a marriage in their State that is otherwise unlawful, is precluded by the provisions of G. L. c. 207, §§ 11, 12, and 13.

[5]Because marriage is, by all accounts, the cornerstone of our social structure, as well as the defining relationship in our personal lives, confining eligibility in the institution, and all of its accompanying benefits and responsibilities, to opposite-sex couples is basely unfair. To justify the restriction in our marriage laws by accusing the plaintiffs of attempting to change the institution of marriage itself terminates the debate at the outset without any accompanying reasoned analysis.

unequivocal language of art. 1, in order to ensure that the governmental conduct challenged here conforms to the supreme charter of our Commonwealth. "A written constitution is the fundamental law for the government of a sovereign State. It is the final statement of the rights, privileges and obligations of the citizens and the ultimate grant of the powers and the conclusive definition of the limitations of the departments of State and of public officers . . . . To its provisions the conduct of all governmental affairs must conform. From its terms there is no appeal." *Loring* v. *Young*, 239 Mass. 349, 376-377 (1921). I do not doubt the sincerity of deeply held moral or religious beliefs that make inconceivable to some the notion that any change in the common-law definition of what constitutes a legal civil marriage is now, or ever would be, warranted. But, as matter of constitutional law, neither the mantra of tradition, nor individual conviction, can justify the perpetuation of a hierarchy in which couples of the same sex and their families are deemed less worthy of social and legal recognition than couples of the opposite sex and their families. See *Lawrence* v. *Texas*, 123 S. Ct. 2472, 2486 (2003) (O'Connor, J., concurring) (moral disapproval, with no other valid State interest, cannot justify law that discriminates against groups of persons); *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 850 (1992) ("Our obligation is to define the liberty of all, not to mandate our own moral code").

(b) I am hopeful that our decision will be accepted by those thoughtful citizens who believe that same-sex unions should not be approved by the State. I am not referring here to acceptance in the sense of grudging acknowledgment of the court's authority to adjudicate the matter. My hope is more liberating. The plaintiffs are members of our community, our neighbors, our coworkers, our friends. As pointed out by the court, their professions include investment advisor, computer engineer, teacher, therapist, and lawyer. The plaintiffs volunteer in our schools, worship beside us in our religious houses, and have children who play with our children, to mention just a few ordinary daily contacts. We share a common humanity and participate together in the social contract that is the foundation of our Commonwealth. Simple principles of decency dictate that we

extend to the plaintiffs, and to their new status, full acceptance, tolerance, and respect. We should do so because it is the right thing to do. The union of two people contemplated by G. L. c. 207 "is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions." *Griswold* v. *Connecticut,* 381 U.S. 479, 486 (1965). Because of the terms of art. 1, the plaintiffs will no longer be excluded from that association.[6]


SPINA, J. (dissenting, with whom Sosman and Cordy, JJ., join). What is at stake in this case is not the unequal treatment of individuals or whether individual rights have been impermissibly burdened, but the power of the Legislature to effectuate social change without interference from the courts, pursuant to

---

[6]Justice Cordy's separate opinion points out, correctly, that, when art. 1 was revised by the people in 1976, it was not then intended to be relied on to approve same-sex marriage. *Post* at 377-379 (Cordy, J., dissenting). (Justice Spina adverts to the same proposition in his separate opinion, *post* at 355 [Spina, J., dissenting]). Decisions construing the provision cited in Justice Cordy's opinion are interesting, but obviously inapposite because they have not dealt in any significant way with the issue before us. Nonetheless, the separate opinion concludes, from what was intended in 1976, and from various cases discussing art. 1, that the revised provision cannot be used to justify the result I reach.

In so reasoning, the separate opinion places itself squarely on the side of the original intent school of constitutional interpretation. As a general principle, I do not accept the philosophy of the school. The Massachusetts Constitution was never meant to create dogma that adopts inflexible views of one time to deny lawful rights to those who live in another. The provisions of our Constitution are, and must be, adaptable to changing circumstances and new societal phenomena, and, unless and until the people speak again on a specific subject, conformable in their concepts of liberty and equality to what is fair, right, and just. I am cognizant of the voters' intent in passing the amendment to art. 1 in 1976. Were the revision alone the basis for change, I would be reluctant to construe it favorably to the plaintiffs, in view of the amendment's recent passage and the voters' intent. The court's opinion, however, rests in part on well-established principles of equal protection that are independent of the amendment. It is on these principles that I base my opinion.

art. 30 of the Massachusetts Declaration of Rights.[1] The power to regulate marriage lies with the Legislature, not with the judiciary. See *Commonwealth* v. *Stowell*, 389 Mass. 171, 175 (1983). Today, the court has transformed its role as protector of individual rights into the role of creator of rights, and I respectfully dissent.

1. *Equal protection.* Although the court did not address the plaintiffs' gender discrimination claim, G. L. c. 207 does not unconstitutionally discriminate on the basis of gender.[2] A claim of gender discrimination will lie where it is shown that differential treatment disadvantages one sex over the other. See *Attorney Gen.* v. *Massachusetts Interscholastic Athletic Ass'n*, 378 Mass. 342, 349-352 (1979). See also *United States* v. *Virginia*, 518 U.S. 515 (1996). General Laws c. 207 enumerates certain qualifications for obtaining a marriage license. It creates no distinction between the sexes, but applies to men and women in precisely the same way. It does not create any disadvantage identified with gender, as both men and women are similarly limited to marrying a person of the opposite sex. See *Commonwealth* v. *King*, 374 Mass. 5, 15-22 (1977) (law prohibiting prostitution not discriminatory based on gender because of equal application to men and women).

Similarly, the marriage statutes do not discriminate on the basis of sexual orientation. As the court correctly recognizes, constitutional protections are extended to individuals, not couples. *Ante* at 326 n.15. The marriage statutes do not disqualify individuals on the basis of sexual orientation from entering into marriage. All individuals, with certain exceptions not relevant here, are free to marry. Whether an individual chooses not to marry because of sexual orientation or any other reason should be of no concern to the court.

The court concludes, however, that G. L. c. 207 unconstitutionally discriminates against the individual plaintiffs because it

---

[1]Article 30 of the Massachusetts Declaration of Rights provides that "the judicial [department] shall never exercise the legislative and executive powers . . . to the end it may be a government of laws and not of men."

[2]Article 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Amendments, the Equal Rights Amendment, states: "Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

denies them the "right to marry the person of one's choice" where that person is of the same sex. *Ante* at 328. To reach this result the court relies on *Loving* v. *Virginia*, 388 U.S. 1, 12 (1967), and transforms "choice" into the essential element of the institution of marriage. The *Loving* case did not use the word "choice" in this manner, and it did not point to the result that the court reaches today. In *Loving*, the Supreme Court struck down as unconstitutional a statute that prohibited Caucasians from marrying non-Caucasians. It concluded that the statute was intended to preserve white supremacy and invidiously discriminated against non-Caucasians because of their race. See *id.* at 11-12. The "choice" to which the Supreme Court referred was the "choice to marry," and it concluded that with respect to the institution of marriage, the State had no compelling interest in limiting the choice to marry along racial lines. *Id.* The Supreme Court did not imply the existence of a right to marry a person of the same sex. To the same effect is *Perez* v. *Sharp*, 32 Cal. 2d 711 (1948), on which the court also relies.

Unlike the *Loving* and *Sharp* cases, the Massachusetts Legislature has erected no barrier to marriage that intentionally discriminates against anyone. Within the institution of marriage,[3] anyone is free to marry, with certain exceptions that are not challenged. In the absence of any discriminatory purpose, the State's marriage statutes do not violate principles of equal protection. See *Washington* v. *Davis*, 426 U.S. 229, 240 (1976) ("invidious quality of a law claimed to be . . . discriminatory must ultimately be traced to a . . . discriminatory purpose"); *Dickerson* v. *Attorney Gen.*, 396 Mass. 740, 743 (1986) (for purpose of equal protection analysis, standard of review under State and Federal Constitutions is identical). See also *Attorney Gen.* v. *Massachusetts Interscholastic Athletic Ass'n*, *supra*. This court should not have invoked even the most deferential standard of review within equal protection analysis because no individual was denied access to the institution of marriage.

2. *Due process.* The marriage statutes do not impermissibly burden a right protected by our constitutional guarantee of due

---

[3]Marriage is the civil union between a single man and a single woman. See *Milford* v. *Worcester*, 7 Mass. 48, 52 (1810).

process implicit in art. 10 of our Declaration of Rights. There is
no restriction on the right of any plaintiff to enter into marriage.
Each is free to marry a willing person of the opposite sex. Cf.
*Zablocki* v. *Redhail,* 434 U.S. 374 (1978) (fundamental right to
marry impermissibly burdened by statute requiring court ap-
proval when subject to child support order).

Substantive due process protects individual rights against
unwarranted government intrusion. See *Aime* v. *Commonwealth,*
414 Mass. 667, 673 (1993). The court states, as we have said on
many occasions, that the Massachusetts Declaration of Rights
may protect a right in ways that exceed the protection afforded
by the Federal Constitution. *Ante* at 328. See *Arizona* v. *Evans,*
514 U.S. 1, 8 (1995) (State courts afforded broader protection
of rights than granted by United States Constitution). However,
today the court does not fashion a remedy that affords greater
protection of a right. Instead, using the rubric of due process, it
has redefined marriage.

Although art. 10 may afford greater protection of rights than
the due process clause of the Fourteenth Amendment, our treat-
ment of due process challenges adheres to the same standards
followed in Federal due process analysis. See *Commonwealth* v.
*Ellis,* 429 Mass. 362, 371 (1999). When analyzing a claim that
the State has impermissibly burdened an individual's fundamen-
tal or other right or liberty interest, "[w]e begin by sketching
the contours of the right asserted. We then inquire whether the
challenged restriction burdens that right." *Moe* v. *Secretary of
Admin. & Fin.,* 382 Mass. 629, 646 (1981). Where a right
deemed "fundamental" is implicated, the challenged restriction
will be upheld only if it is "narrowly tailored to further a
legitimate and compelling governmental interest." *Aime* v. *Com-
monwealth, supra* at 673. To qualify as "fundamental" the as-
serted right must be "objectively, 'deeply rooted in this Nation's
history and tradition,' [*Moore* v. *East Cleveland,* 431 U.S. 494,
503 (1977) (plurality opinion)] . . . and 'implicit in the concept
of ordered liberty,' such that 'neither liberty nor justice would
exist if they were sacrificed.' " *Washington* v. *Glucksberg,* 521
U.S. 702, 720-721 (1997), quoting *Palko* v. *Connecticut,* 302
U.S. 319, 325, 326 (1937) (right to assisted suicide does not fall
within fundamental right to refuse medical treatment because

novel and unsupported by tradition) (citations omitted). See *Three Juveniles* v. *Commonwealth*, 390 Mass. 357, 367 (1983) (O'Connor, J., dissenting), cert. denied sub nom. *Keefe* v. *Massachusetts*, 465 U.S. 1068 (1984). Rights that are not considered fundamental merit due process protection if they have been irrationally burdened. See *Massachusetts Fed'n of Teachers* v. *Board of Educ.*, 436 Mass. 763, 777-779 & n.14 (2002).

Although this court did not state that same-sex marriage is a fundamental right worthy of strict scrutiny protection, it nonetheless deemed it a constitutionally protected right by applying rational basis review. Before applying any level of constitutional analysis there must be a recognized right at stake. Same-sex marriage, or the "right to marry the person of one's choice" as the court today defines that right, does not fall within the fundamental right to marry. Same-sex marriage is not "deeply rooted in this Nation's history," and the court does not suggest that it is. Except for the occasional isolated decision in recent years, see, e.g., *Baker* v. *State*, 170 Vt. 194 (1999), same-sex marriage is not a right, fundamental or otherwise, recognized in this country. Just one example of the Legislature's refusal to recognize same-sex marriage can be found in a section of the legislation amending G. L. c. 151B to prohibit discrimination in the workplace on the basis of sexual orientation, which states: "Nothing in this act shall be construed so as to legitimize or validate a 'homosexual marriage'. . . ." St. 1989, c. 516, § 19. In this Commonwealth and in this country, the roots of the institution of marriage are deeply set in history as a civil union between a single man and a single woman. There is no basis for the court to recognize same-sex marriage as a constitutionally protected right.

3. *Remedy.* The remedy that the court has fashioned both in the name of equal protection and due process exceeds the bounds of judicial restraint mandated by art. 30. The remedy that construes gender-specific language as gender-neutral amounts to a statutory revision that replaces the intent of the Legislature with that of the court. Article 30 permits the court to apply principles of equal protection and to modify statutory language only if legislative intent is preserved. See, e.g., *Commonwealth* v. *Chou*, 433 Mass. 229, 238-239 (2001) (judicial

rewriting of gender language permissible only when Legislature intended to include both men and women). See also *Lowell* v. *Kowalski*, 380 Mass. 663, 670 (1980). Here, the alteration of the gender-specific language alters precisely what the Legislature unambiguously intended to preserve, the marital rights of single men and women. Such a dramatic change in social institutions must remain at the behest of the people through the democratic process.

Where the application of equal protection principles do not permit rewriting a statute in a manner that preserves the intent of the Legislature, we do not rewrite the statute. In *Dalli* v. *Board of Educ.*, 358 Mass. 753 (1971), the court refused to rewrite a statute in a manner that would include unintended individuals. "To attempt to interpret this [statute] as including those in the category of the plaintiff would be to engage in a judicial enlargement of the clear statutory language beyond the limit of our judicial function. We have traditionally and consistently declined to trespass on legislative territory in defer-ence to the time tested wisdom of the separation of powers as expressed in art. [30] of the Declaration of Rights of the Constitution of Massachusetts even when it appeared that a highly desirable and just result might thus be achieved." *Id.* at 759. Recently, in *Connors* v. *Boston*, 430 Mass. 31 (1999), we refused to expand health insurance coverage to include domestic partners because such an expansion was within the province of the Legislature, where policy affecting family relationships is most appropriate and frequently considered. *Id.* at 42-43. Principles of equal protection do not permit the marriage statutes to be changed in the manner that we have seen today.

This court has previously exercised the judicial restraint mandated by art. 30 and declined to extend due process protec-tion to rights not traditionally coveted, despite recognition of their social importance. See *Tobin's Case*, 424 Mass. 250, 252-253 (1997) (receiving workers' compensation benefits not fundamental right); *Doe* v. *Superintendent of Schs. of Worcester*, 421 Mass. 117, 129 (1995) (declaring education not fundamental right); *Williams* v. *Secretary of the Executive Office of Human Servs.*, 414 Mass. 551, 565 (1993) (no fundamental right to receive mental health services); *Matter of Tocci*, 413 Mass. 542,

548 n.4 (1992) (no fundamental right to practice law); *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 542 (1974) (no fundamental right to pursue one's business). Courts have authority to recognize rights that are supported by the Constitution and history, but the power to create novel rights is reserved for the people through the democratic and legislative processes.

Likewise, the Supreme Court exercises restraint in the application of substantive due process " 'because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' [*Collins* v. *Harker Heights*, 503 U.S. 115, 125 (1992).] By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' [*id.*], lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court, *Moore* [v. *East Cleveland*, 431 U.S. 494, 502 (1977)] (plurality opinion)." *Washington* v. *Glucksberg, supra* at 720.

The court has extruded a new right from principles of substantive due process, and in doing so it has distorted the meaning and purpose of due process. The purpose of substantive due process is to protect existing rights, not to create new rights. Its aim is to thwart government intrusion, not invite it. The court asserts that the Massachusetts Declaration of Rights serves to guard against government intrusion into each individual's sphere of privacy. *Ante* at 329. Similarly, the Supreme Court has called for increased due process protection when individual privacy and intimacy are threatened by unnecessary government imposition. See, e.g., *Lawrence* v. *Texas*, 123 S. Ct. 2472 (2003) (private nature of sexual behavior implicates increased due process protection); *Eisenstadt* v. *Baird*, 405 U.S. 438 (1972) (privacy protection extended to procreation decisions within nonmarital context); *Griswold* v. *Connecticut*, 381 U.S. 479 (1965) (due process invoked because of intimate nature of procreation decisions). These cases, along with the *Moe* case, focus on the threat to privacy when government seeks to regulate the most intimate activity behind bedroom doors. The statute in question does not seek to regulate intimate activity

within an intimate relationship, but merely gives formal recognition to a particular marriage. The State has respected the private lives of the plaintiffs, and has done nothing to intrude in the relationships that each of the plaintiff couples enjoy. Cf. *Lawrence* v. *Texas, supra* at 2484 (case "does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter"). Ironically, by extending the marriage laws to same-sex couples the court has turned substantive due process on its head and used it to interject government into the plaintiffs' lives.

SOSMAN, J. (dissenting, with whom Spina and Cordy, JJ., join). In applying the rational basis test to any challenged statutory scheme, the issue is not whether the Legislature's rationale behind that scheme is persuasive to us, but only whether it satisfies a minimal threshold of rationality. Today, rather than apply that test, the court announces that, because it is persuaded that there are no differences between same-sex and opposite-sex couples, the Legislature has no rational basis for treating them differently with respect to the granting of marriage licenses.[1] Reduced to its essence, the court's opinion concludes that, because same-sex couples are now raising children, and withholding the benefits of civil marriage from their union makes it harder for them to raise those children, the State must therefore provide the benefits of civil marriage to same-sex couples just as it does to opposite-sex couples. Of course, many people are raising children outside the confines of traditional marriage, and, by definition, those children are being deprived of the various benefits that would flow if they were being raised in a household with married parents. That does not mean that the

[1] The one difference that the court acknowledges — that sexual relations between persons of the same sex does not result in pregnancy and childbirth — it immediately brushes aside on the theory that civil marriage somehow has nothing to do with begetting children. *Ante* at 331-333. For the reasons explained in detail in Justice Cordy's dissent, in which I join, the reasons justifying the civil marriage laws are inextricably linked to the fact that human sexual intercourse between a man and a woman frequently results in pregnancy and childbirth. Indeed, as Justice Cordy outlines, that fact lies at the core of why society fashioned the institution of marriage in the first place. *Post* at 381-382 (Cordy, J., dissenting).

Legislature must accord the full benefits of marital status on every household raising children. Rather, the Legislature need only have some rational basis for concluding that, at present, those alternate family structures have not yet been conclusively shown to be the equivalent of the marital family structure that has established itself as a successful one over a period of centuries. People are of course at liberty to raise their children in various family structures, so long as they are not literally harming their children by doing so. See *Blixt* v. *Blixt*, 437 Mass. 649, 668-670 (2002) (Sosman, J., dissenting), cert. denied, 537 U.S. 1189 (2003). That does not mean that the State is required to provide identical forms of encouragement, endorsement, and support to all of the infinite variety of household structures that a free society permits.

Based on our own philosophy of child rearing, and on our observations of the children being raised by same-sex couples to whom we are personally close, we may be of the view that what matters to children is not the gender, or sexual orientation, or even the number of the adults who raise them, but rather whether those adults provide the children with a nurturing, stable, safe, consistent, and supportive environment in which to mature. Same-sex couples can provide their children with the requisite nurturing, stable, safe, consistent, and supportive environment in which to mature, just as opposite-sex couples do. It is therefore understandable that the court might view the traditional definition of marriage as an unnecessary anachronism, rooted in historical prejudices that modern society has in large measure rejected and biological limitations that modern science has overcome.

It is not, however, our assessment that matters. Conspicuously absent from the court's opinion today is any acknowledgment that the attempts at scientific study of the ramifications of raising children in same-sex couple households are themselves in their infancy and have so far produced inconclusive and conflicting results. Notwithstanding our belief that gender and sexual orientation of parents should not matter to the success of the child rearing venture, studies to date reveal that there are still some observable differences between children raised by opposite-sex couples and children raised by same-sex couples.

See *post* at 386-387 (Cordy, J., dissenting). Interpretation of the data gathered by those studies then becomes clouded by the personal and political beliefs of the investigators, both as to whether the differences identified are positive or negative, and as to the untested explanations of what might account for those differences. (This is hardly the first time in history that the ostensible steel of the scientific method has melted and buckled under the intense heat of political and religious passions.) Even in the absence of bias or political agenda behind the various studies of children raised by same-sex couples, the most neutral and strict application of scientific principles to this field would be constrained by the limited period of observation that has been available. Gay and lesbian couples living together openly, and official recognition of them as their children's sole parents, comprise a very recent phenomenon, and the recency of that phenomenon has not yet permitted any study of how those children fare as adults and at best minimal study of how they fare during their adolescent years. The Legislature can rationally view the state of the scientific evidence as unsettled on the critical question it now faces: Are families headed by same-sex parents equally successful in rearing children from infancy to adulthood as families headed by parents of opposite sexes? Our belief that children raised by same-sex couples *should* fare the same as children raised in traditional families is just that: a passionately held but utterly untested belief. The Legislature is not required to share that belief but may, as the creator of the institution of civil marriage, wish to see the proof before making a fundamental alteration to that institution.

Although ostensibly applying the rational basis test to the civil marriage statutes, it is abundantly apparent that the court is in fact applying some undefined stricter standard to assess the constitutionality of the marriage statutes' exclusion of same-sex couples. While avoiding any express conclusion as to any of the proffered routes by which that exclusion would be subjected to a test of strict scrutiny — infringement of a fundamental right, discrimination based on gender, or discrimination against gays and lesbians as a suspect classification — the opinion repeatedly alludes to those concepts in a prolonged and eloquent prelude before articulating its view that the exclusion lacks

even a rational basis. See, e.g., *ante* at 313 (noting that State Constitution is "more protective of individual liberty and equality," demands "broader protection for fundamental rights," and is "less tolerant of government intrusion into the protected spheres of private life" than Federal Constitution); *ante* at 322 (describing decision to marry and choice of marital partner as "among life's momentous acts of self-definition"); *ante* at 326 (repeated references to "right to marry" as "fundamental"); *ante* at 327-328 (repeated comparisons to statutes prohibiting interracial marriage, which were predicated on suspect classification of race); *ante* at 328 (characterizing ban on same-sex marriage as "invidious" discrimination that "deprives individuals of access to an institution of fundamental legal, personal, and social significance" and again noting that Massachusetts Constitution "protects matters of personal liberty against government incursion" more zealously than Federal Constitution); *ante* at 329 (characterizing "whom to marry, how to express sexual intimacy, and whether and how to establish a family" as "among the most basic of every individual's liberty and due process rights"); *id.* ("liberty interest in choosing whether and whom to marry would be hollow" if Commonwealth could "foreclose an individual from freely choosing the person" to marry); *ante* at 333 (opining that in "overlapping realms of personal autonomy, marriage, family life, and child rearing," characterized as "fundamentally private areas of life," court uses "integrated" analysis instead of "narrow focus"). See also *ante* at 337 n.29 (suggesting that prohibition on same-sex marriage "impose[s] limits on personal beliefs"); *ante* at 339 n.31 (suggesting that "total deference" to Legislature in this case would be equivalent to "strip[ping]" judiciary "of its constitutional authority to decide challenges" in such areas as forced sterilization, antimiscegenation statutes, and abortion, even though all cited examples pertain to fundamental rights analyzed under strict scrutiny, not under rational basis test); *ante* at 339 (civil marriage as "a right of fundamental importance"); *ante* at 341 (noting State policy of "preventing discrimination on the basis of sexual orientation"); *id.* (prohibition against same-sex marriage inconsistent with "gender-neutral laws promoting stable families," and "rooted in

persistent prejudices against" homosexuals); *ante* at 342 (prohibition against same-sex marriage "violates the basic premises of individual liberty"). In short, while claiming to apply a mere rational basis test, the court's opinion works up an enormous head of steam by repeated invocations of avenues by which to subject the statute to strict scrutiny, apparently hoping that that head of steam will generate momentum sufficient to propel the opinion across the yawning chasm of the very deferential rational basis test.

Shorn of these emotion-laden invocations, the opinion ultimately opines that the Legislature is acting irrationally when it grants benefits to a proven successful family structure while denying the same benefits to a recent, perhaps promising, but essentially untested alternate family structure. Placed in a more neutral context, the court would never find any irrationality in such an approach. For example, if the issue were government subsidies and tax benefits promoting use of an established technology for energy efficient heating, the court would find no equal protection or due process violation in the Legislature's decision not to grant the same benefits to an inventor or manufacturer of some new, alternative technology who did not yet have sufficient data to prove that that new technology was just as good as the established technology. That the early results from preliminary testing of the new technology might look very promising, or that the theoretical underpinnings of the new technology might appear flawless, would not make it irrational for the Legislature to grant subsidies and tax breaks to the established technology and deny them to the still unproved newcomer in the field. While programs that affect families and children register higher on our emotional scale than programs affecting energy efficiency, our standards for what is or is not "rational" should not be bent by those emotional tugs. Where, as here, there is no ground for applying strict scrutiny, the emotionally compelling nature of the subject matter should not affect the manner in which we apply the rational basis test.

Or, to the extent that the court is going to invoke such emotion-laden and value-laden rhetoric as a means of heightening the degree of scrutiny to be applied, the same form of rhetoric can be employed to justify the Legislature's proceeding with extreme caution in this area. In considering whether the

Legislature has a rational reason for postponing a dramatic change to the definition of marriage, it is surely pertinent to the inquiry to recognize that this proffered change affects not just a load-bearing wall of our social structure but the very cornerstone of that structure. See *post* at 393 (Cordy, J., dissenting). Before making a fundamental alteration to that cornerstone, it is eminently rational for the Legislature to require a high degree of certainty as to the precise consequences of that alteration, to make sure that it can be done safely, without either temporary or lasting damage to the structural integrity of the entire edifice. The court today blithely assumes that there are no such dangers and that it is safe to proceed (see *ante* at 340), an assumption that is not supported by anything more than the court's blind faith that it is so.

More importantly, it is not our confidence in the lack of adverse consequences that is at issue, or even whether that confidence is justifiable. The issue is whether it is rational to reserve judgment on whether this change can be made at this time without damaging the institution of marriage or adversely affecting the critical role it has played in our society. Absent consensus on the issue (which obviously does not exist), or unanimity amongst scientists studying the issue (which also does not exist), or a more prolonged period of observation of this new family structure (which has not yet been possible), it is rational for the Legislature to postpone any redefinition of marriage that would include same-sex couples until such time as it is certain that that redefinition will not have unintended and undesirable social consequences. Through the political process, the people may decide when the benefits of extending civil marriage to same-sex couples have been shown to outweigh whatever risks — be they palpable or ephemeral — are involved. However minimal the risks of that redefinition of marriage may seem to us from our vantage point, it is not up to us to decide what risks society must run, and it is inappropriate for us to arrogate that power to ourselves merely because we are confident that "it is the right thing to do." *Ante* at 350 (Greaney, J., concurring).

As a matter of social history, today's opinion may represent a great turning point that many will hail as a tremendous step

toward a more just society. As a matter of constitutional jurisprudence, however, the case stands as an aberration. To reach the result it does, the court has tortured the rational basis test beyond recognition. I fully appreciate the strength of the temptation to find this particular law unconstitutional — there is much to be said for the argument that excluding gay and lesbian couples from the benefits of civil marriage is cruelly unfair and hopelessly outdated; the inability to marry has a profound impact on the personal lives of committed gay and lesbian couples (and their children) to whom we are personally close (our friends, neighbors, family members, classmates, and co-workers); and our resolution of this issue takes place under the intense glare of national and international publicity. Speaking metaphorically, these factors have combined to turn the case before us into a "perfect storm" of a constitutional question. In my view, however, such factors make it all the more imperative that we adhere precisely and scrupulously to the established guideposts of our constitutional jurisprudence, a jurisprudence that makes the rational basis test an extremely deferential one that focuses on the rationality, not the persuasiveness, of the potential justifications for the classifications in the legislative scheme. I trust that, once this particular "storm" clears, we will return to the rational basis test as it has always been understood and applied. Applying that deferential test in the manner it is customarily applied, the exclusion of gay and lesbian couples from the institution of civil marriage passes constitutional muster. I respectfully dissent.

CORDY, J. (dissenting, with whom Spina and Sosman, JJ., join). The court's opinion concludes that the Department of Public Health has failed to identify any "constitutionally adequate reason" for limiting civil marriage to opposite-sex unions, and that there is no "reasonable relationship" between a disqualification of same-sex couples who wish to enter into a civil marriage and the protection of public health, safety, or general welfare. Consequently, it holds that the marriage statute cannot withstand scrutiny under the Massachusetts Constitution. Because I find these conclusions to be unsupportable in light of the nature of the rights and regulations at issue, the presumption

of constitutional validity and significant deference afforded to legislative enactments, and the "undesirability of the judiciary substituting its notions of correct policy for that of a popularly elected Legislature" responsible for making such policy, *Zayre Corp.* v. *Attorney Gen.*, 372 Mass. 423, 433 (1977), I respectfully dissent. Although it may be desirable for many reasons to extend to same-sex couples the benefits and burdens of civil marriage (and the plaintiffs have made a powerfully reasoned case for that extension), that decision must be made by the Legislature, not the court.

If a statute either impairs the exercise of a fundamental right protected by the due process or liberty provisions of our State Constitution, or discriminates based on a constitutionally suspect classification such as sex, it will be subject to strict scrutiny when its validity is challenged. See *Blixt* v. *Blixt*, 437 Mass. 649, 655-656, 660-661 (2002), cert. denied, 537 U.S. 1189 (2003) (fundamental right); *Lowell* v. *Kowalski*, 380 Mass. 663, 666 (1980) (sex-based classification). If it does neither, a statute "will be upheld if it is 'rationally related to a legitimate State purpose.' " *Hallett* v. *Wrentham*, 398 Mass. 550, 557 (1986), quoting *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 649 (1977). This test, referred to in State and Federal constitutional jurisprudence as the "rational basis test,"[1] is virtually identical in substance and effect to the test applied to a law promulgated under the State's broad police powers (pursuant to which the marriage statutes and most other licensing and regulatory laws are enacted): that is, the law is valid if it is reasonably related to the protection of public health, safety, or general welfare. See, e.g., *Leigh* v. *Board of Registration in Nursing*, 395 Mass. 670, 682-683 (1985) (applying rational basis review to question of State exercise of police power).

The Massachusetts marriage statute does not impair the exercise of a recognized fundamental right, or discriminate on the basis of sex in violation of the equal rights amendment to the Massachusetts Constitution. Consequently, it is subject to

---

[1] The rational basis standard applied under the Massachusetts Constitution and the Fourteenth Amendment to the United States Constitution is the same. See *Chebacco Liquor Mart, Inc.* v. *Alcoholic Beverages Control Comm'n*, 429 Mass. 721, 722-723 (1999).

review only to determine whether it satisfies the rational basis test. Because a conceivable rational basis exists upon which the Legislature could conclude that the marriage statute furthers the legitimate State purpose of ensuring, promoting, and supporting an optimal social structure for the bearing and raising of children, it is a valid exercise of the State's police power.

A. *Limiting marriage to the union of one man and one woman does not impair the exercise of a fundamental right.* Civil marriage is an institution created by the State. In Massachusetts, the marriage statutes are derived from English common law, see *Commonwealth* v. *Knowlton*, 2 Mass. 530, 534 (1807), and were first enacted in colonial times. *Commonwealth* v. *Munson*, 127 Mass. 459, 460 (1879). They were enacted to secure public interests and not for religious purposes or to promote personal interests or aspirations. (See discussion *infra* at 381-385 ). As the court notes in its opinion, the institution of marriage is "the legal union of a man and woman as husband and wife," *ante* at 319, and it has always been so under Massachusetts law, colonial or otherwise.

The plaintiffs contend that because the right to choose to marry is a "fundamental" right, the right to marry the person of one's choice, including a member of the same sex, must also be a "fundamental" right. While the court stops short of deciding that the right to marry someone of the same sex is "fundamental" such that strict scrutiny must be applied to any statute that impairs it, it nevertheless agrees with the plaintiffs that the right to choose to marry is of fundamental importance ("among the most basic" of every person's "liberty and due process rights") and would be "hollow" if an individual was foreclosed from "freely choosing the person with whom to share . . . the . . . institution of civil marriage." *Ante* at 329. Hence, it concludes that a marriage license cannot be denied to an individual who wishes to marry someone of the same sex. In reaching this result the court has transmuted the "right" to marry into a right to change the institution of marriage itself. This feat of reasoning succeeds only if one accepts the proposition that the definition of the institution of marriage as a union between a man and a woman is merely "conclusory" (as suggested, *ante* at 348 [Greaney, J., concurring]), rather than the basis on which the

"right" to partake in it has been deemed to be of fundamental importance. In other words, only by assuming that "marriage" includes the union of two persons of the same sex does the court conclude that restricting marriage to opposite-sex couples infringes on the "right" of same-sex couples to "marry."[2]

The plaintiffs ground their contention that they have a fundamental right to marry a person of the same sex in a long line of Supreme Court decisions, e.g., *Turner* v. *Safley*, 482 U.S. 78 (1987); *Zablocki* v. *Redhail*, 434 U.S. 374 (1978); *Loving* v. *Virginia*, 388 U.S. 1 (1967); *Griswold* v. *Connecticut*, 381 U.S. 479 (1965); *Skinner* v. *Oklahoma*, 316 U.S. 535 (1942); that discuss the importance of marriage. In context, all of these decisions and their discussions are about the "fundamental" nature of the institution of marriage as it has existed and been understood in this country, not as the court has redefined it today. Even in that context, its "fundamental" nature is derivative of the nature of the interests that underlie or are associated with it.[3] An examination of those interests reveals that they are either not shared by same-sex couples or not implicated by the marriage statutes.

Supreme Court cases that have described marriage or the right to marry as "fundamental" have focused primarily on the underlying interest of every individual in procreation, which, historically, could only legally occur within the construct of marriage because sexual intercourse outside of marriage was a

[2]The same semantic sleight of hand could transform every other restriction on marriage into an infringement of a right of fundamental importance. For example, if one assumes that a group of mature, consenting, committed adults can form a "marriage," the prohibition on polygamy (G. L. c. 207, § 4), infringes on their "right" to "marry." In legal analysis as in mathematics, it is fundamentally erroneous to assume the truth of the very thing that is to be proved.

[3]Casting the right to civil marriage as a "fundamental right" in the constitutional sense is somewhat peculiar. It is not referred to as such in either the State or Federal Constitution, and unlike other recognized fundamental rights (such as the right to procreate, the right to be free of government restraint, or the right to refuse medical treatment), civil marriage is wholly a creature of State statute. If by enacting a civil marriage statutory scheme Massachusetts has created a fundamental right, then it could never repeal its own statute without violating the fundamental rights of its inhabitants.

criminal act.[4] In *Skinner* v. *Oklahoma, supra,* the first case to characterize marriage as a "fundamental" right, the Supreme Court stated, as its rationale for striking down a sterilization statute, that "[m]arriage and procreation are fundamental to the very existence of the race." *Id.* at 541. In concluding that a sterilized individual "is forever deprived of a basic liberty," *id.,* the Court was obviously referring to procreation rather than marriage, as this court recognized in *Matter of Moe,* 385 Mass. 555, 560 (1982). Similarly, in *Loving* v. *Virginia, supra,* in which the United States Supreme Court struck down Virginia's antimiscegenation statute, the Court implicitly linked marriage with procreation in describing marriage as "fundamental to our very existence." *Id.* at 12. In *Zablocki* v. *Redhail, supra,* the Court expressly linked the right to marry with the right to procreate, concluding that "if [the plaintiff's] right to procreate means anything at all, it must imply some right to enter the only relationship in which the State . . . allows sexual relations legally to take place." *Id.* at 386. Once again, in *Turner* v. *Safley, supra,* striking a State regulation that curtailed the right of an inmate to marry, the Court included among the important attributes of such marriages the "expectation that [the marriage] ultimately will be fully consummated." *Id.* at 96. See *Milford* v. *Worcester,* 7 Mass. 48, 52 (1810) (purpose of marriage is "to regulate, chasten, and refine, the intercourse between the sexes; and to multiply [and] preserve . . . the species"). Because same-sex couples are unable to procreate on their own, any right to marriage they may possess cannot be based on their interest in procreation, which has been essential to the Supreme Court's denomination of the right to marry as fundamental.

Supreme Court cases recognizing a right to privacy in intimate decision-making, e.g., *Griswold* v. *Connecticut, supra* (striking down statute prohibiting use of contraceptives); *Roe* v. *Wade,* 410 U.S. 113 (1973) (striking down statute criminalizing abortion), have also focused primarily on sexual relations and the decision whether or not to procreate, and have refused to recognize an "unlimited right" to privacy. *Id.* at 154. Massachusetts courts have been no more willing than the Federal

---

[4]For example, see G. L. c. 272, §§ 14 and 18, the Massachusetts adultery and fornication statutes.

courts to adopt a "universal[]" "privacy doctrine," *Marcoux* v. *Attorney Gen.*, 375 Mass. 63, 67 (1978), or to derive "controversial 'new' rights from the Constitution." *Aime* v. *Commonwealth*, 414 Mass. 667, 674 n.10 (1993).

What the *Griswold* Court found "repulsive to the notions of privacy surrounding the marriage relationship" was the prospect of "allow[ing] the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives." *Griswold* v. *Connecticut, supra* at 485-486. See *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629, 658 (1981), quoting L. Tribe, American Constitutional Law 924 (1978) (finding it "difficult to imagine a clearer case of bodily intrusion" than being forced to bear a child). When Justice Goldberg spoke of "marital relations" in the context of finding it "difficult to imagine what is more private or more intimate than a husband and wife's marital relations[hip]," *Griswold* v. *Connecticut, supra* at 495 (Goldberg, J., concurring), he was obviously referring to sexual relations.[5] Similarly, in *Lawrence* v. *Texas*, 123 S. Ct. 2472 (2003), it was the criminalization of private sexual behavior that the Court found violative of the petitioners' liberty interest.

In Massachusetts jurisprudence, protected decisions generally have been limited to those concerning "whether or not to beget or bear a child," *Matter of Moe*, 385 Mass. 555, 564 (1982) (see *Opinion of the Justices*, 423 Mass. 1201, 1234-1235 [1996] ["focus of (the *Griswold* and *Roe* cases) and the cases following them has been the intrusion . . . into the especially intimate aspects of a person's life implicated in procreation and child-bearing"]); how to raise a child, see *Care & Protection of Robert*, 408 Mass. 52, 58, 60 (1990); or whether or not to accept medical treatment, see *Brophy* v. *New England Sinai Hosp., Inc.*, 398 Mass. 417, 430 (1986); *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 742 (1977), none of which is at issue here. See also *Commonwealth* v. *Balthazar*, 366 Mass. 298, 301 (1974) (statute punishing unnatural and

[5]While the facts of *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), involved a married couple, later decisions clarify that its holding was not premised on the marriage relationship. See *Carey* v. *Populations Servs. Int'l*, 431 U.S. 678, 687 (1977) (stating that *Griswold* rested on "right of the *individual*" to be free from governmental interference with child-bearing decisions [emphasis in original]); *Eisenstadt* v. *Baird*, 405 U.S. 438, 453-454 (1972) (same).

lascivious acts does not apply to sexual conduct engaged in by adults in private, in light of "articulation of the constitutional right of an individual to be free from government regulation of certain sex related activities").

The marriage statute, which regulates only the act of obtaining a marriage license, does not implicate privacy in the sense that it has found constitutional protection under Massachusetts and Federal law. Cf. *Commonwealth* v. *King*, 374 Mass. 5, 14 (1977) (solicitation of prostitution "while in a place to which the public had access" implicated no "constitutionally protected rights of privacy"); *Marcoux* v. *Attorney Gen., supra* at 68 (right to privacy, at most, protects conduct "limited more or less to the hearth"). It does not intrude on any right that the plaintiffs have to privacy in their choices regarding procreation, an intimate partner or sexual relations.[6] The plaintiffs' right to privacy in such matters does not require that the State officially endorse their choices in order for the right to be constitutionally vindicated.

Although some of the privacy cases also speak in terms of personal autonomy, no court has ever recognized such an open-ended right. "That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected . . . ." *Washington* v. *Glucksberg*, 521 U.S. 702, 727 (1997). Such decisions are protected not because they are important, intimate, and personal, but because the right or liberty at stake is "so deeply rooted in our history and traditions, or so fundamental to our concept of constitutionally ordered liberty" that it is protected by due process. *Id.* Accordingly, the Supreme Court has concluded that while the decision to refuse unwanted medical treatment is fundamental, *Cruzan* v. *Director, Mo. Dep't of Health*, 497 U.S. 261, 278 (1990), because it is deeply rooted in our nation's history and tradition, the equally personal and profound decision to commit suicide is not because of the absence of such roots. *Washington* v. *Glucksberg, supra.*

---

[6]Contrast *Lawrence* v. *Texas*, 123 S. Ct. 2472 (2003), in which the United States Supreme Court struck down the Texas criminal sodomy statute because it constituted State intrusion on some of these very choices.

While the institution of marriage is deeply rooted in the history and traditions of our country and our State, the right to marry someone of the same sex is not. No matter how personal or intimate a decision to marry someone of the same sex might be, the right to make it is not guaranteed by the right of personal autonomy.

The protected right to freedom of association, in the sense of freedom of choice "to enter into and maintain certain intimate human relationships," *Roberts* v. *United States Jaycees*, 468 U.S. 609, 617 (1984) (as an element of liberty or due process rather than free speech), is similarly limited and unimpaired by the marriage statute. As recognized by the Supreme Court, that right affords protection only to "certain kinds of highly personal relationships," *id.* at 618, such as those between husband and wife, parent and child, and among close relatives, *id.* at 619, that "have played a critical role in the culture and traditions of the Nation," *id.* at 618-619, and are "deeply rooted in this Nation's history and tradition." *Moore* v. *East Cleveland*, 431 U.S. 494, 498-499, 503 (1977) (distinguishing on this basis between family and nonfamily relationships). Unlike opposite-sex marriages, which have deep historic roots, or the parent-child relationship, which reflects a "strong tradition" founded on "the history and culture of Western civilization" and "is now established beyond debate as an enduring American tradition," *Wisconsin* v. *Yoder*, 406 U.S. 205, 232 (1972); or extended family relationships, which have been "honored throughout our history," *Moore* v. *East Cleveland, supra* at 505, same-sex relationships, although becoming more accepted, are certainly not so "deeply rooted in this Nation's history and tradition" as to warrant such enhanced constitutional protection.

Although "expressions of emotional support and public commitment" have been recognized as among the attributes of marriage, which, "*[t]aken together* . . . form a constitutionally protected marital relationship" (emphasis added), *Turner* v. *Safley*, 482 U.S. 78, 95, 96 (1987), those interests, standing alone, are not the source of a fundamental right to marry. While damage to one's "status in the community" may be sufficient harm to confer standing to sue, *Lowell* v. *Kowalski*, 380 Mass. 663, 667 (1980), such status has never been recognized as a

fundamental right. See *Paul* v. *Davis*, 424 U.S. 693, 701 (1976) (mere damage to reputation does not constitute deprivation of "liberty").

Finally, the constitutionally protected interest in child rearing, recognized in *Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923); *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534-535 (1925); and *Care & Protection of Robert*, *supra* at 58, 60, is not implicated or infringed by the marriage statute here. The fact that the plaintiffs cannot marry has no bearing on their independently protected constitutional rights as parents which, as with opposite-sex parents, are limited only by their continued fitness and the best interests of their children. *Bezio* v. *Patenaude*, 381 Mass. 563, 579 (1980) (courts may not use parent's sexual orientation as reason to deny child custody).

Because the rights and interests discussed above do not afford the plaintiffs any fundamental right that would be impaired by a statute limiting marriage to members of the opposite sex, they have no fundamental right to be declared "married" by the State.

Insofar as the right to marry someone of the same sex is neither found in the unique historical context of our Constitution[7] nor compelled by the meaning ascribed by this court to the liberty and due process protections contained within it, should the court nevertheless recognize it as a fundamental right? The consequences of deeming a right to be "fundamental" are profound, and this court, as well as the Supreme Court, has been very cautious in recognizing them.[8] Such caution is required by separation of powers principles. If a right is found

---

[7]The statutes from which our current marriage laws derive were enacted prior to or shortly after the adoption of our Constitution in 1780, and "may well be considered . . . as affording some light in regard to the views and intentions of [the Constitution's] founders." *Merriam* v. *Secretary of the Commonwealth*, 375 Mass. 246, 253 (1978).

[8]*Tobin's Case*, 424 Mass. 250, 252-253 (1997) (no fundamental right to receive workers' compensation benefits); *Doe* v. *Superintendent of Schs. of Worcester*, 421 Mass. 117, 129 (1995) (no fundamental right to education); *Williams* v. *Secretary of the Executive Office of Human Servs.*, 414 Mass. 551, 565 (1993) (no fundamental right to receive mental health services); *Matter of Tocci*, 413 Mass. 542, 548 n.4 (1992) (no fundamental right to practice law); *Rushworth* v. *Registrar of Motor Vehicles*, 413 Mass. 265, 269 n.5 (1992) (no fundamental right to operate motor vehicle); *English* v. *New England Med.*

to be "fundamental," it is, to a great extent, removed from "the arena of public debate and legislative action"; utmost care must be taken when breaking new ground in this field "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges]." *Washington* v. *Glucksberg*, 521 U.S. 702, 720 (1997).

"[T]o rein in" the otherwise potentially unlimited scope of substantive due process rights, *id.* at 722, both Federal and Massachusetts courts have recognized as "fundamental" only those "rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' [*Moore* v. *East Cleveland*, *supra* at 503] . . . and 'implicit in the concept of ordered liberty.' " *Id.* at 720-721, quoting *Palko* v. *Connecticut*, 302 U.S. 319, 325 (1937). See *Dutil, petitioner*, 437 Mass. 9, 13 (2002) (same). In the area of family-related rights in particular, the Supreme Court has emphasized that the "Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted." *Moore* v. *East Cleveland*, *supra*.[9]

Applying this limiting principle, the Supreme Court, as noted above, declined to recognize a fundamental right to physician-assisted suicide, which would have required "revers[ing] centuries of legal doctrine and practice, and strik[ing] down the considered policy choice of almost every State." *Washington* v.

---

*Ctr., Inc.*, 405 Mass. 423, 429 (1989), cert. denied, 493 U.S. 1056 (1990) (no fundamental right to recover tort damages); *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 542 (1974) (no fundamental right to pursue one's business). Cf. *Aime* v. *Commonwealth*, 414 Mass. 667, 674 n.10 (1993) (recognizing right to be free from physical restraint "does not involve judicial derivation of controversial 'new' rights from the Constitution"). See generally *Williams* v. *Secretary of the Executive Office of Human Servs.*, *supra* at 566 (recognizing fundamental right to receive mental health services "would represent an enormous and unwarranted extension of the judiciary into the [Department of Mental Health]'s authority"); *Ford* v. *Grafton*, 44 Mass. App. Ct. 715, 730-731, cert. denied, 525 U.S. 1040 (1998), quoting *DeShaney* v. *Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 203 (1989) ("people of Massachusetts may choose by legislation to [provide remedies for "grievous harm"] . . . however, 'they should not have [such remedies] thrust upon them by this Court's expansion of the Due Process Clause . . .").

[9]See *Michael H.* v. *Gerald D.*, 491 U.S. 110, 122-123 & n.3, 127 (1989) (plurality opinion) (limits on substantive due process rights center on "respect for the teachings of history"); *Griswold* v. *Connecticut*, 381 U.S. 479, 501 (1965) (Harlan, J., concurring) (same).

*Glucksberg, supra* at 723. While recognizing that public attitudes toward assisted suicide are currently the subject of "earnest and profound debate," the Court nevertheless left the continuation and resolution of that debate to the political arena, "as it should be in a democratic society." *Id.* at 719, 735.

Similarly, Massachusetts courts have declined to recognize rights that are not so deeply rooted.[10] As this court noted in considering whether to recognize a right of terminally ill patients to refuse life-prolonging treatment, "the law always lags behind the most advanced thinking in every area," and must await "some common ground, some consensus." *Superintendent of Belchertown State Sch.* v. *Saikewicz,* 373 Mass. 728, 737 (1977), quoting Burger, The Law and Medical Advances, 67 Annals Internal Med. Supp. 7, 15, 17 (1967). See *Blixt* v. *Blixt,* 437 Mass. 649, 662-663 n.22 (2002) ("social consensus about family relationships is relevant to the constitutional limits on State intervention").

This is not to say that a statute that has no rational basis must nevertheless be upheld so long as it is of ancient origin. However, "[t]he long history of a certain practice . . . and its

---

[10]Compare *Curtis* v. *School Comm. of Falmouth,* 420 Mass. 749, 756 (1995), cert. denied, 516 U.S. 1067 (1996), quoting *Wisconsin* v. *Yoder,* 406 U.S. 205, 232 (1972) ("primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Aime* v. *Commonwealth, supra* at 676 ("right to be free from governmental detention and restraint is firmly embedded in the history of Anglo-American law"); *Brophy* v. *New England Sinai Hosp., Inc.,* 398 Mass. 417, 430 (1986) (right to make decisions to accept or reject medical treatment "has its roots deep in our history" and "has come to be widely recognized and respected"); and *Moe* v. *Secretary of Admin. & Fin.,* 382 Mass. 629, 649 (1981) (characterizing decision whether to bear child as "hold[ing] a particularly important place in the history of the right of privacy" and finding "something approaching consensus" on right to refuse unwanted infringement of bodily integrity), with *Trigones* v. *Attorney Gen.,* 420 Mass. 859, 863 (1995), quoting *Medina* v. *California,* 505 U.S. 437, 445 (1992) (upholding statute that does not "offend some principle of justice so rooted in the tradition and conscience of our people as to be ranked fundamental"); *Three Juveniles* v. *Commonwealth,* 390 Mass. 357, 364 (1983), cert. denied sub nom. *Keefe* v. *Massachusetts,* 465 U.S. 1068 (1984) (declining to find fundamental right to child-parent privilege where "[n]either Congress nor the Legislature of any State has seen fit to adopt a rule granting [such] a privilege . . ."); *Commonwealth* v. *Stowell,* 389 Mass. 171, 174 (1983), quoting *Roe* v. *Wade,* 410 U.S. 113, 152 (1973) (declining to recognize right not "implicit in the concept of ordered liberty").

acceptance as an uncontroversial part of our national and State tradition do suggest that [the court] should reflect carefully before striking it down." *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 557 (1979). As this court has recognized, the "fact that a challenged practice 'is followed by a large number of states . . . is plainly worth considering in determining whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' " *Commonwealth* v. *Kostka*, 370 Mass. 516, 533 (1976), quoting *Leland* v. *Oregon*, 343 U.S. 790, 798 (1952).

Although public attitudes toward marriage in general and same-sex marriage in particular have changed and are still evolving, "the asserted contemporary concept of marriage and societal interests for which [plaintiffs] contend" are "manifestly [less] deeply founded" than the "historic institution" of marriage. *Matter of the Estate of Cooper*, 187 A.D.2d 128, 133-134 (N.Y. 1993). Indeed, it is not readily apparent to what extent contemporary values have embraced the concept of same-sex marriage. Perhaps the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures," *Atkins* v. *Virginia*, 536 U.S. 304, 312 (2002), quoting *Penry* v. *Lynaugh*, 492 U.S. 302, 331 (1989). No State Legislature has enacted laws permitting same-sex marriages; and a large majority of States, as well as the United States Congress, have affirmatively prohibited the recognition of such marriages for any purpose. See P. Greenberg, State Laws Affecting Lesbians and Gays, National Conference of State Legislatures Legisbriefs at 1 (April/May 2001) (reporting that, as of May, 2001, thirty-six States had enacted "defense of marriage" statutes); 1 U.S.C. § 7 (2000); 28 U.S.C. § 1738C (2000) (Federal Defense of Marriage Act).

Given this history and the current state of public opinion, as reflected in the actions of the people's elected representatives, it cannot be said that "a right to same-sex marriage is so rooted in the traditions and collective conscience of our people that failure to recognize it would violate the fundamental principles of liberty and justice that lie at the base of all our civil and political institutions. Neither . . . [is] a right to same-sex marriage

. . . implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it were sacrificed." *Baehr* v. *Lewin*, 74 Haw. 530, 556-557 (1993). See *Dean* v. *District of Columbia*, 653 A.2d 307, 333 (D.C. 1995) (per curiam) (Ferren, J., concurring in part and dissenting in part); *Baker* v. *Nelson*, 291 Minn. 310, 312 (1971), appeal dismissed, 409 U.S. 810 (1972); *Storrs* v. *Holcomb*, 168 Misc. 2d 898, 899-900 (N.Y. Sup. Ct. 1996), dismissed, 245 A.D.2d 943 (N.Y. 1997).[11] In such circumstances, the law with respect to same-sex marriages must be left to develop through legislative processes, subject to the constraints of rationality, lest the court be viewed as using the liberty and due process clauses as vehicles merely to enforce its own views regarding better social policies, a role that the strongly worded separation of powers principles in art. 30 of the Declaration of Rights of our Constitution forbids, and for which the court is particularly ill suited.

B. *The marriage statute, in limiting marriage to heterosexual couples, does not constitute discrimination on the basis of sex in violation of the Equal Rights Amendment to the Massachusetts Constitution.* In his concurrence, Justice Greaney contends that the marriage statute constitutes discrimination on the basis of sex in violation of art. 1 of the Declaration of Rights as amended by art. 106 of the Amendments to the Constitution of the Commonwealth, the Equal Rights Amendment (ERA).[12] Such a conclusion is analytically unsound and inconsistent with the legislative history of the ERA.

The central purpose of the ERA was to eradicate discrimination against women and in favor of men or vice versa. See *Attorney Gen.* v. *Massachusetts Interscholastic Athletic Ass'n*, 378

---

[11]Because of the absence of deep historical roots, every court but one that has considered recognizing a fundamental right to same-sex marriage has declined to do so. See, e.g., *Standhardt* v. *Superior Court*, 77 P.3d 451 (Ariz. Ct. App. 2003); *Dean* v. *District of Columbia*, 653 A.2d 307, 333 (D.C. 1995) (per curiam) (Ferren, J., concurring in part and dissenting in part); *Baehr* v. *Lewin*, 74 Haw. 530, 556-557 (1993); *Baker* v. *Nelson*, 291 Minn. 310, 312-314 (1971); *Storrs* v. *Holcomb*, 168 Misc. 2d 898, 899-900 (N.Y. Sup. Ct. 1996), dismissed, 245 A.D.2d 943 (N.Y. 1997). The one exception was the Alaska Superior Court, which relied on that State's Constitution's express and broadly construed right to privacy. *Brause vs. Bureau of Vital Statistics*, No. 3AN-95-6562CJ (Alaska Super. Ct. Feb. 27, 1998).

[12]Article 106 is referred to as the Equal Rights Amendment.

Mass. 342, 357 (1979). Consistent with this purpose, we have construed the ERA to prohibit laws that advantage one sex at the expense of the other, but not laws that treat men and women equally, *id.* at 346-349 (assuming that "separate but equal" treatment of males and females would be constitutionally permissible). The Massachusetts marriage statute does not subject men to different treatment from women; each is equally prohibited from precisely the same conduct. See *Baker* v. *State*, 170 Vt. 194, 215 n.13 (1999) ("there is no discrete class subject to differential treatment solely on the basis of sex"). Compare *Commonwealth* v. *King*, 374 Mass. 5, 16 (1977) (law prohibiting prostitution applied to both male and female prostitutes and therefore did not discriminate), and *Personnel Adm'r of Mass.* v. *Feeney*, 442 U.S. 256, 274-275 (1979) (declining to characterize veterans' preference as sex discrimination because it applied to both male and female veterans), with *Attorney Gen.* v. *Massachusetts Interscholastic Athletic Ass'n, supra,* and *Lowell* v. *Kowalski*, 380 Mass. 663 (1980) (where statutes and rules at issue advantaged one sex over another).

Of course, a statute that on its face treats protected groups equally may still harm, stigmatize, or advantage one over the other. Such was the circumstance in *Loving* v. *Virginia*, 388 U.S. 1 (1967), where the Supreme Court struck down a State statute that made interracial marriage a crime, as constituting invidious discrimination on the basis of race. While the statute purported to apply equally to whites and nonwhites, the Court found that it was intended and structured to favor one race (white) and disfavor all others (nonwhites). The statute's legislative history demonstrated that its purpose was not merely to punish interracial marriage, but to do so for the sole benefit of the white race. As the Supreme Court readily concluded, the Virginia law was "designed to maintain White Supremacy." *Id.* at 11. Consequently, there was a fit between the class that the law was intended to discriminate against (nonwhite races) and the classification enjoying heightened protection (race).

By contrast, here there is no evidence that limiting marriage to opposite-sex couples was motivated by sexism in general or a desire to disadvantage men or women in particular. Moreover, no one has identified any harm, burden, disadvantage, or

advantage accruing to either gender as a consequence of the Massachusetts marriage statute. In the absence of such effect, the statute limiting marriage to couples of the opposite sex does not violate the ERA's prohibition of sex discrimination.[13]

This conclusion is buttressed by the legislative history of the ERA, which was adopted by the voters on November 2, 1976, after being approved by constitutional conventions of the Legislature on August 15, 1973, (by a vote of 261-0) and May 14, 1975 (by a vote of 217-55).

In anticipation of its adoption, the Legislature enacted and, on June 21, 1975, the Governor approved a "Resolve providing for an investigation and study by a special commission relative to the effect of the ratification of the proposed amendments to the Constitution of the Commonwealth of Massachusetts and the Constitution of the United States prohibiting discrimination on account of sex upon the laws, business communities and public in the Commonwealth." Res. 1975, c. 26. One of the principal tasks of the commission was to catalog the aspects of the General Laws that would have to be amended for the statutory code to comply with the mandate of the proposed amendment that equality not be abridged on the basis of sex.[14]

On October 19, 1976, just before the general election at which the amendment was to be considered, the commission filed its Interim Report, which focused on the effect of the Massachusetts ERA on the laws of the Commonwealth. 1976 Senate Doc. No. 1689. A section of the report, entitled "Areas Unaffected by the

---

[13]Justice Greaney views *Loving* v. *Virginia*, 388 U.S. 1 (1967), as standing analogously for the proposition that just as a person cannot be barred from marrying another person because of his or her race, a person cannot be barred from marrying another person because of his or her sex. *Ante* at 346-347 (Greaney, J., concurring). While superficially attractive, this analogy does not withstand closer scrutiny. Unlike Virginia's antimiscegenation statute, neither the purpose nor effect of the Massachusetts marriage statute is to advantage or disadvantage one gender over the other. This distinction is critical and was central to the *Loving* decision. More fundamentally, the statute at issue burdened marriage with a requirement that was both constitutionally suspect and unrelated to protecting either the underlying purposes or nature of the institution. In contrast, the limitation of marriage to one man and one woman preserves both its structure and its historic purposes.

[14]The commission was composed of five State representatives, three State senators and three gubernatorial appointees. All of the gubernatorial appointees were attorneys.

Equal Rights Amendment," addressed some of the legal regimes that would *not* be affected by the adoption of the ERA. One such area was "Homosexual Marriage," about which the commission stated:

> "An equal rights amendment will have no effect upon the allowance or denial of homosexual marriages. The equal rights amendment is not concerned with the relationship of two persons of the same sex; it only addresses those laws or public-related actions which treat persons of opposite sexes differently. The Washington Court of Appeals has already stated that the equal rights amendment to its state constitution did not afford a basis for validating homosexual marriages. In Colorado, the attorney general has likewise issued an opinion that the state equal rights amendment did not validate homosexual marriage. There are no cases which have used a state equal rights amendment to either validate or require the allowance of homosexual marriages." (Footnotes omitted.)

*Id.* at 21-22.[15]

The views of the commission were reflected in the public debate surrounding the passage of the ERA that focused on gender equality. See, e.g., Referenda reviewed, Boston Globe, Nov. 1, 1976, at 26; Voters' guide on nine state referendum measures, Boston Herald American, Nov. 1, 1976, at 17. Claims that the ERA might be the basis for validating marriages between same-sex couples were labelled as "exaggerated" and "unfounded." For example, before the vote, the Boston Globe published an editorial discussing and urging favorable action on the ERA. In making its case, it noted that "[t]hose urging a no vote . . . argue that the amendment would . . . legitimize marriage between people of the same sex [and other changes]. In reality, the proposed amendment would require none of these things. Mass. ballot issues . . . 1 Equal Rights Amendment. Boston Globe, Nov. 1, 1976, at 29. And in the aftermath of the vote, the Boston Globe heralded the electorate's acceptance of "the arguments of proponents that the proposal would not result

---

[15]The Washington case cited by the commission was *Singer* v. *Hara*, 11 Wash. App. 247 (1974).

in many far-reaching or threatening changes." Referendums fared poorly, Boston Globe, Nov. 4, 1976, at 29.

While the court, in interpreting a constitutional amendment, is not bound to accept either the views of a legislative commission studying and reporting on the amendment's likely effects, or of public commentary and debate contemporaneous with its passage, it ought to be wary of completely disregarding what appears to be the clear intent of the people recently recorded in our constitutional history. This is particularly so where the plain wording of the amendment does not require the result it would reach.

C. *The marriage statute satisfies the rational basis standard.* The burden of demonstrating that a statute does not satisfy the rational basis standard rests on the plaintiffs. It is a weighty one. "[A] reviewing court will presume a statute's validity, and make all rational inferences in favor of it. . . . The Legislature is not required to justify its classifications, nor provide a record or finding in support of them." (Citation omitted.) *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 650 (1977). The statute "only need[s to] be supported by a conceivable rational basis." *Fine* v. *Contributory Retirement Appeal Bd.*, 401 Mass. 639, 641 (1988). See *Massachusetts Fed'n of Teachers* v. *Board of Educ.*, 436 Mass. 763, 771-772 (2002). As this court stated in *Shell Oil Co.* v. *Revere*, 383 Mass. 682, 687-688 (1981):

> "[I]t is not the court's function to launch an inquiry to resolve a debate which has already been settled in the legislative forum. '[I]t [is] the judge's duty . . . to give effect to the will of the people as expressed in the statute by their representative body. It is in this way . . . that the doctrine of separation of powers is given meaning.' *Commonwealth* v. *Leis*, 355 Mass. 189, 202 (1969) (Kirk, J., concurring).
>
> "This respect for the legislative process means that it is not the province of the court to sit and weigh conflicting evidence supporting or opposing a legislative enactment. . . .
>
> "Although persons challenging the constitutionality of legislation may introduce evidence in support of their

claim that the legislation is irrational . . . they will not prevail if 'the question is at least debatable' in view of the evidence which may have been available to the Legislature. *United States* v. *Carolene Prods. Co.*, 304 U.S. 144, 154 (1938)."

The "time tested wisdom of the separation of powers" requires courts to avoid "judicial legislation in the guise of new constructions to meet real or supposed new popular viewpoints, preserving always to the Legislature alone its proper prerogative of adjusting the statutes to changed conditions." *Pielech* v. *Massasoit Greyhound, Inc.*, 423 Mass. 534, 539, 540 (1996), cert. denied, 520 U.S. 1131 (1997), quoting *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 595 (1975).

In analyzing whether a statute satisfies the rational basis standard, we look to the nature of the classification embodied in the enactment, then to whether the statute serves a legitimate State purpose, and finally to whether the classification is reasonably related to the furtherance of that purpose. With this framework, we turn to the challenged statute, G. L. c. 207, which authorizes local town officials to issue licenses to couples of the opposite sex authorizing them to enter the institution of civil marriage.

1. *Classification.* The nature of the classification at issue is readily apparent. Opposite-sex couples can obtain a license and same-sex couples cannot. The granting of this license, and the completion of the required solemnization of the marriage, opens the door to many statutory benefits and imposes numerous responsibilities. The fact that the statute does not permit such licenses to be issued to couples of the same sex thus bars them from civil marriage. The classification is not drawn between men and women or between heterosexuals and homosexuals, any of whom can obtain a license to marry a member of the opposite sex; rather, it is drawn between same-sex couples and opposite-sex couples.

2. *State purpose.* The court's opinion concedes that the civil marriage statute serves legitimate State purposes, but further investigation and elaboration of those purposes is both helpful and necessary.

Civil marriage is the institutional mechanism by which societies have sanctioned and recognized particular family structures, and the institution of marriage has existed as one of the fundamental organizing principles of human society. See C.N. Degler, The Emergence of the Modern American Family, in The American Family in Social-Historical Perspective 61 (3d ed. 1983); A.J. Hawkins, Introduction, in Revitalizing the Institution of Marriage for the Twenty-First Century: An Agenda for Strengthening Marriage xiv (2002); C. Lasch, Social Pathologists and the Socialization of Reproduction, in The American Family in Social-Historical Perspective, *supra* at 80; W.J. O'Donnell & D.A. Jones, Marriage and Marital Alternatives 1 (1982); L. Saxton, The Individual, Marriage, and the Family 229-230, 260 (1968); M.A. Schwartz & B.M. Scott, Marriages and Families: Diversity and Change 4 (1994); Wardle, "Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation, 24 Harv. J.L. & Pub. Pol'y 771, 777-780 (2001); J.Q. Wilson, The Marriage Problem: How Our Culture Has Weakened Families 28, 40, 66-67 (2002). Marriage has not been merely a contractual arrangement for legally defining the private relationship between two individuals (although that is certainly part of any marriage). Rather, on an institutional level, marriage is the "very basis of the whole fabric of civilized society," J.P. Bishop, Commentaries on the Law of Marriage and Divorce, and Evidence in Matrimonial Suits § 32 (1852), and it serves many important political, economic, social, educational, procreational, and personal functions.

Paramount among its many important functions, the institution of marriage has systematically provided for the regulation of heterosexual behavior, brought order to the resulting procreation, and ensured a stable family structure in which children will be reared, educated, and socialized. See *Milford* v. *Worcester*, 7 Mass. 48, 52 (1810) (civil marriage "intended to regulate, chasten, and refine, the intercourse between the sexes; and to multiply, preserve, and improve the species"). See also P. Blumstein & P. Schwartz, American Couples: Money, Work, Sex 29 (1983); C.N. Degler, *supra* at 61; G. Douglas, Marriage, Cohabitation, and Parenthood From Contract to Status?, in Cross Currents: Family Law and Policy in the United States and

England 223 (2000); S.L. Nock, The Social Costs of De-Institutionalizing Marriage, in Revitalizing the Institution of Marriage for the Twenty-First Century: An Agenda for Strengthening Marriage, *supra* at 7; L. Saxton, *supra* at 239-240, 242; M.A. Schwartz & B.M. Scott, *supra* at 4-6; Wardle, *supra* at 781-796; J.Q. Wilson, *supra* at 23-32. Admittedly, heterosexual intercourse, procreation, and child care are not necessarily conjoined (particularly in the modern age of widespread effective contraception and supportive social welfare programs), but an orderly society requires some mechanism for coping with the fact that sexual intercourse commonly results in pregnancy and childbirth. The institution of marriage is that mechanism.

The institution of marriage provides the important legal and normative link between heterosexual intercourse and procreation on the one hand and family responsibilities on the other. The partners in a marriage are expected to engage in exclusive sexual relations, with children the probable result and paternity presumed. See G. L. c. 209C, § 6 ("a man is presumed to be the father of a child . . . if he is or has been married to the mother and the child was born during the marriage, or within three hundred days after the marriage was terminated by death, annulment or divorce"). Whereas the relationship between mother and child is demonstratively and predictably created and recognizable through the biological process of pregnancy and childbirth, there is no corresponding process for creating a relationship between father and child.[16] Similarly, aside from an act of heterosexual intercourse nine months prior to childbirth, there is no process for creating a relationship between a man and a woman as the parents of a particular child. The institution of marriage fills this void by formally binding the husband-father to his wife and child, and imposing on him the responsibilities of fatherhood. See J.Q. Wilson, *supra* at 23-32. See also P. Blumstein & P. Schwartz, *supra* at 29; C.N. Degler, *supra* at 61; G. Douglas, *supra* at 223; S.L. Nock, *supra* at 7; L. Saxton, *supra* at 239-240, 242; M.A. Schwartz & B.M. Scott, *supra* at 4-6; Wardle, *supra* at 781-796. The alternative, a

[16]Modern DNA testing may reveal actual paternity, but it establishes only a genetic relationship between father and child.

society without the institution of marriage, in which heterosexual intercourse, procreation, and child care are largely disconnected processes, would be chaotic.

The marital family is also the foremost setting for the education and socialization of children. Children learn about the world and their place in it primarily from those who raise them, and those children eventually grow up to exert some influence, great or small, positive or negative, on society. The institution of marriage encourages parents to remain committed to each other and to their children as they grow, thereby encouraging a stable venue for the education and socialization of children. See P. Blumstein & P. Schwartz, *supra* at 26; C.N. Degler, *supra* at 61; S.L. Nock, *supra* at 2-3; C. Lasch, *supra* at 81; M.A. Schwartz & B.M. Scott, *supra* at 6-7. More macroscopically, construction of a family through marriage also formalizes the bonds between people in an ordered and institutional manner, thereby facilitating a foundation of interconnectedness and interdependency on which more intricate stabilizing social structures might be built. See M. Grossberg, Governing the Hearth: Law and Family in Nineteenth-Century America 10 (1985); C. Lasch, *supra*; L. Saxton, *supra* at 260; J.Q. Wilson, *supra* at 221.

This court, among others, has consistently acknowledged both the institutional importance of marriage as an organizing principle of society, and the State's interest in regulating it. See *French* v. *McAnarney*, 290 Mass. 544, 546 (1935) ("Marriage is not merely a contract between the parties. It is the foundation of the family. It is a social institution of the highest importance. The Commonwealth has a deep interest that its integrity is not jeopardized"); *Milford* v. *Worcester*, 7 Mass. 48, 52 (1810) ("Marriage, being essential to the peace and harmony, and to the virtues and improvements of civil society, it has been, in all well-regulated governments, among the first attentions of the civil magistrate to regulate [it]"). See also *Skinner* v. *Oklahoma*, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the [human] race"); *Maynard* v. *Hill*, 125 U.S. 190, 211 (1888) (marriage "is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family

and of society, without which there would be neither civilization nor progress"); *Murphy* v. *Ramsey*, 114 U.S. 15, 45 (1885) ("no legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth . . . than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from the union for life of one man and one woman . . . the sure foundation of all that is stable and noble in our civilization; the best guaranty of that reverent morality which is the source of all beneficent progress in social and political improvement"); *Reynolds* v. *United States*, 98 U.S. 145, 165 (1878) ("Upon [marriage] society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal").

It is undeniably true that dramatic historical shifts in our cultural, political, and economic landscape have altered some of our traditional notions about marriage, including the interpersonal dynamics within it,[17] the range of responsibilities required of it as an institution,[18] and the legal environment in which it exists.[19] Nevertheless, the institution of marriage remains the principal weave of our social fabric. See C.N. Degler, *supra* at 61; A.J. Hawkins, Introduction, in Revitalizing the Institution of Marriage for the Twenty-First Century: An Agenda for Strengthening Marriage xiv (2002); C. Lasch, *supra* at 80; W.J. O'Donnell & D.A. Jones, Marriage and Marital Alternatives 1 (1982); L. Saxton, *supra* at 229-230, 260; M.A. Schwartz & B.M. Scott, *supra* at 4; Wardle, *supra* at 777-780; J.Q. Wilson, *supra* at 28, 40, 66-67. A family defined by heterosexual marriage continues to be the most prevalent social structure into which the vast majority of children are born, nurtured, and prepared for productive participation in civil society, see Children's Living Arrangements and Characteristics: March,

---

[17]The normative relationship between husband and wife has changed markedly due to the overwhelming movement toward gender equality both at home and in the marketplace.

[18]The availability of a variety of social welfare programs and public education has in many instances affected the status of the marital family as the only environment dedicated to the care, protection, and education of children.

[19]No-fault divorce has made the dissolution of marriage much easier than ever before.

2002, United States Census Bureau Current Population Reports at 3 (June, 2003) (in 2002, 69% of children lived with two married parents, 23% lived with their mother, 5% lived with their father, and 4% lived in households with neither parent present).

It is difficult to imagine a State purpose more important and legitimate than ensuring, promoting, and supporting an optimal social structure within which to bear and raise children. At the very least, the marriage statute continues to serve this important State purpose.[20]

3. *Rational relationship.* The question we must turn to next is whether the statute, construed as limiting marriage to couples of the opposite sex, remains a rational way to further that purpose. Stated differently, we ask whether a conceivable rational basis exists on which the Legislature could conclude that continuing to limit the institution of civil marriage to members of the opposite sex furthers the legitimate purpose of ensuring, promoting, and supporting an optimal social structure for the bearing and raising of children.[21]

In considering whether such a rational basis exists, we defer to the decision-making process of the Legislature, and must make deferential assumptions about the information that it might

---

[20]"It is important to distinguish the individual interests in domestic relations from the social interest in the family and marriage as social institutions." Pound, Individual Interests in the Domestic Relations, 14 Mich. L. Rev. 177, 177 (1916). The court's opinion blurs this important distinction and emphasizes the personal and emotional dimensions that often accompany marriage. It is, however, only society's interest in the institution of marriage as a stabilizing social structure that justifies the statutory benefits and burdens that attend to the status provided by its laws. Personal fulfilment and public celebrations or announcements of commitment have little if anything to do with the purpose of the civil marriage laws, or with a legitimate public interest that would justify them.

[21]In support of its conclusion that the marriage statute does not satisfy the rational basis test, the court emphasizes that "[t]he department has offered no evidence that forbidding marriage to people of the same sex will increase the number of couples choosing to enter into opposite-sex marriages in order to have and raise children." *Ante* at 334. This surprising statement misallocates the burden of proof in a constitutional challenge to the rational basis of a statute (see *supra* at 379). It is the plaintiffs who must prove that supporting and promoting one form of relationship by providing (as is pointed out) literally hundreds of benefits, could not conceivably affect the decision-making of anyone considering whether to bear and raise a child. The department is not required to present "evidence" of anything.

consider and on which it may rely. See *Shell Oil Co.* v. *Revere*, 383 Mass. 682, 688 (1981) (court considers "evidence which *may* have been available to the Legislature" [emphasis added]); *Slome* v. *Chief of Police of Fitchburg*, 304 Mass. 187, 189 (1939) ("any rational basis of fact that can be reasonably conceived" may support legislative finding); *Mutual Loan Co.* v. *Martell*, 200 Mass. 482, 487 (1909), aff'd, 222 U.S. 225 (1911) ("Legislature may be supposed to have known" relevant facts).

We must assume that the Legislature (1) might conclude that the institution of civil marriage has successfully and continually provided this structure over several centuries[22]; (2) might consider and credit studies that document negative consequences that too often follow children either born outside of marriage or raised in households lacking either a father or a mother figure,[23] and scholarly commentary contending that children and families

---

[22]See C.N. Degler, The Emergence of the Modern American Family, in The American Family in Social-Historical Perspective 61 (3d ed. 1983); A.J. Hawkins, Introduction, in Revitalizing the Institution of Marriage for the Twenty-First Century: An Agenda for Strengthening Marriage xiv (2002); C. Lasch, Social Pathologists and the Socialization of Reproduction, in The American Family in Social-Historical Perspective, 80 (3d ed. 1983); W.J. O'Donnell & D.A. Jones, The Law of Marriage and Marital Alternatives 1 (1982); L. Saxton, The Individual, Marriage and the Family 229-230, 260 (1968); M.A. Schwartz & B.M. Scott, Marriages and Families: Diversity and Change 4 (1994); Wardle, "Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation, 24 Harv. J.L. & Pub. Pol'y 771, 777-780 (2001); J.Q. Wilson, The Marriage Problem: How Our Culture has Weakened Families 28, 40, 66-67 (2002).

[23]See Rodney, Behavioral Differences between African American Male Adolescents with Biological Fathers and Those Without Biological Fathers in the Home, 30 J. Black Stud. 45, 53 (1999) (African-American juveniles who lived with their biological fathers displayed fewer behavioral problems than those whose biological fathers were absent from home); Chilton, Family Disruption, Delinquent Conduct and the Effect of Subclassification, 37 Am. Soc. Rev. 93, 95 (1972) (proportion of youth charged with juvenile offenses who were not living in husband-wife family was larger than comparable proportion of youth charged with juvenile offenses who were living in husband-wife family); Hoffmann, A National Portrait of Family Structure and Adolescent Drug Use, 60 J. Marriage & Fam. 633 (1998) (children from households with both mother and father reported relatively low use of drugs, whereas children from households without their natural mothers and from other family type households had highest prevalence of drug use). See also D. Blankenhorn, Fatherless America: Confronting Our Most Urgent Social Problem 25 (1995).

develop best when mothers and fathers are partners in their parenting[24]; and (3) would be familiar with many recent studies that variously support the proposition that children raised in intact families headed by same-sex couples fare as well on many measures as children raised in similar families headed by opposite-sex couples[25]; support the proposition that children of same-sex couples fare worse on some measures[26]; or reveal notable differences between the two groups of children that warrant further study.[27]

We must also assume that the Legislature would be aware of the critiques of the methodologies used in virtually all of the comparative studies of children raised in these different environments, cautioning that the sampling populations are not representative, that the observation periods are too limited in time,[28] that the empirical data are unreliable, and that the

[24]H.B. Biller & J.L. Kimpton, The Father and the School-Aged Child, in The Role of The Father in Child Development 143 (3d ed. 1997); H.B. Biller, Fathers and Families: Paternal Factors in Child Development 1-3 (1993); Lynne Marie Kohm, The Homosexual "Union": Should Gay and Lesbian Partnerships be Granted the Same Status as Marriage? 22 J. Contemp. L. 51, 61 & nn.53, 54 (1996) ("[s]tatistics continue to show that the most stable family for children to grow up in is that consisting of a father and a mother").

[25]See, e.g., Patterson, Family Relationships of Lesbians and Gay Men, 62 J. Marriage & Fam. 1052, 1060, 1064-1065 (2000) (concluding that there are no significant differences between children of same-sex parents and children of heterosexual parents in aspects of personal development).

[26]See, e.g., Cameron, Homosexual Parents, 31 Adolescence 757, 770-774 (1996) (concluding results of limited study consonant with notion that children raised by homosexuals disproportionately experience emotional disturbance and sexual victimization).

[27]See, e.g., Stacey, (How) Does the Sexual Orientation of Parents Matter?, 66 Amer. Soc. Rev. 159, 172, 176-179 (2001) (finding significant statistical differences in parenting practices, gender roles, sexual behavior but noting that "heterosexism" and political implications have constrained research). See also Coleman, Reinvestigating Remarriage: Another Decade of Progress, 62 J. Marriage & Fam. 1288 (2000) (concluding that future studies of impact of divorce and remarriage on children should focus on "nontraditional" stepfamilies, particularly same-sex couples with children, because impact of such arrangements have been overlooked in other studies).

[28]In Massachusetts, for example, the State's adoption laws were only recently interpreted to permit adoption by same-sex partners. Adoption of Tammy, 416 Mass. 205 (1993). It is fair to assume that most of the children affected by that ruling, who properly would be the subject of study in their teenage and adult years, are still only children today.

hypotheses are too infused with political or agenda driven bias. See, e.g., R. Lerner & A.K. Nagai, No Basis: What the Studies Don't Tell Us About Same-Sex Parenting, Marriage Law Project (Jan. 2001) (criticizing forty-nine studies on same-sex parenting — at least twenty-six of which were cited by amici in this case — as suffering from flaws in formulation of hypotheses, use of experimental controls, use of measurements, sampling and statistical testing, and finding false negatives); Stacey, (How) Does the Sexual Orientation of Parents Matter, 66 Am. Soc. Rev. 159, 159-166 (2001) (highlighting problems with sampling pools, lack of longitudinal studies, and political hypotheses).

Taking all of this available information into account, the Legislature could rationally conclude that a family environment with married opposite-sex parents remains the optimal social structure in which to bear children, and that the raising of children by same-sex couples, who by definition cannot be the two sole biological parents of a child and cannot provide children with a parental authority figure of each gender,[29] presents an alternative structure for child rearing that has not yet proved itself beyond reasonable scientific dispute to be as optimal as the biologically based marriage norm. See *Baker* v. *State*, 170 Vt. 194, 222 (1999) ("conceivable that the Legislature could conclude that opposite-sex partners offer advantages in th[e] area [of child rearing], although . . . experts disagree and the answer is decidedly uncertain"). Cf. *Marcoux* v. *Attorney Gen.*, 375 Mass. 63, 65 (1978). Working from the assumption that a recognition of same-sex marriages will increase the number of children experiencing this alternative, the Legislature

---

[29]This family structure raises the prospect of children lacking any parent of their own gender. For example, a boy raised by two lesbians as his parents has no male parent. Contrary to the suggestion that concerns about such a family arrangement is based on "stereotypical" views about the differences between sexes, *ante* at 337 n.28, concern about such an arrangement remains rational. It is, for example, rational to posit that the child himself might invoke gender as a justification for the view that neither of his parents "understands" him, or that they "don't know what he is going through," particularly if his disagreement or dissatisfaction involves some issue pertaining to sex. Given that same-sex couples raising children are a very recent phenomenon, the ramifications of an adolescent child's having two parents but not one of his or her own gender have yet to be fully realized and cannot yet even be tested in significant numbers. But see note 25, *supra*, regarding studies of children raised without parents of each gender.

could conceivably conclude that declining to recognize same-sex marriages remains prudent until empirical questions about its impact on the upbringing of children are resolved.[30]

The fact that the Commonwealth currently allows same-sex couples to adopt, see *Adoption of Tammy*, 416 Mass. 205 (1993), does not affect the rationality of this conclusion. The eligibility of a child for adoption presupposes that at least one of the child's biological parents is unable or unwilling, for some reason, to participate in raising the child. In that sense, society has "lost" the optimal setting in which to raise that child — it is simply not available. In these circumstances, the principal and overriding consideration is the "best interests of the child," considering his or her unique circumstances and the options that are available for that child. The objective is an individualized determination of the best environment for a particular child, where the normative social structure — a home with both the child's biological father and mother — is not an option. That such a focused determination may lead to the approval of a same-sex couple's adoption of a child does not mean that it would be irrational for a legislator, in fashioning statutory laws that cannot make such individualized determinations, to conclude generally that being raised by a same-sex couple has not yet been shown to be the absolute equivalent of being raised by one's married biological parents.

That the State does not preclude different types of families from raising children does not mean that it must view them all as equally optimal and equally deserving of State endorsement and support.[31] For example, single persons are allowed to adopt children, but the fact that the Legislature permits single-parent

[30]The same could be true of any other potentially promising but recent innovation in the relationships of persons raising children.

[31]The plaintiffs also argue that because the State requires insurance companies to provide coverage for diagnosing and treating infertility unrestricted to those who are married, G. L. c. 175, § 47H, limiting marriage to opposite-sex couples is contrary to its currently stated public policy and, therefore, no longer rational. This argument is not persuasive. The fact that the Legislature has seen fit to require that health insurers cover the medical condition of infertility, for all subscribers, is not inconsistent with the State's policy of encouraging and endorsing heterosexual marriage as the optimum structure in which to bear and raise children. There is no rule that requires the State to limit every law bearing on birth and child rearing to the confines of

adoption does not mean that it has endorsed single parenthood as an optimal setting in which to raise children or views it as the equivalent of being raised by both of one's biological parents.[32] The same holds true with respect to same-sex couples — the fact that they may adopt children means only that the Legislature has concluded that they may provide an acceptable setting in which to raise children who cannot be raised by both of their biological parents. The Legislature may rationally permit adoption by same-sex couples yet harbor reservations as to whether parenthood by same-sex couples should be affirmatively encouraged to the same extent as parenthood by the heterosexual couple whose union produced the child.[33]

In addition, the Legislature could conclude that redefining the

heterosexual marriage in order to vindicate its policy of supporting that structure as optimal. Just as the insurance laws relating to infertility coverage cannot be said to be a State endorsement of childbirth out of wedlock, they cannot be said to represent an abandonment of the State's policy regarding a preference that children be born into and raised in the context of heterosexual marriage.

[32]Indeed, just recently, this court reasoned that the Legislature could permissibly conclude that children being raised by single parents "may be at heightened risk for certain kinds of harm when compared with children of so-called intact families," because such children "may not have or be able to draw on the resources of two parents" when having to cope with some form of loss. *Blixt* v. *Blixt*, 437 Mass. 649, 663, 664 (2002), cert. denied, 537 U.S. 1189 (2003). In that case, the differences between single parents and parents raising a child together sufficed to justify subjecting single parents to the grandparent visitation statute, G. L. c. 119, § 39D. *Id.* at 662-664. Because the statute implicated fundamental parental rights, its classifications had to survive strict scrutiny, *id.* at 660, not the mere rational basis test at issue in today's opinion. The fact that single people can adopt children did not insulate them from differential treatment with respect to their parental rights.

[33]Similarly, while the fact that our laws have evolved to include a strong affirmative policy against discrimination on the basis of sexual orientation, have decriminalized intimate adult conduct, and have abolished the legal distinctions between marital and nonmarital children, may well be a reason to celebrate a more open and humane society, they ought not be the basis on which to conclude that there is no longer a rational basis for the current marriage law. See *ante* at 332-333. To conclude the latter based on the former threatens the process of social reform in a democratic society. States must be free to experiment in the realm of social and civil relations, incrementally and without concern that a step or two in one direction will determine the outcome of the experiment as a matter of law. If they are not, those who argue "slippery slope" will have more ammunition than ever to resist any effort at progressive change or social experimentation, and will be able to put the lie to the arguments of the proponents of such efforts, that an incremental step

institution of marriage to permit same-sex couples to marry would impair the State's interest in promoting and supporting heterosexual marriage as the social institution that it has determined best normalizes, stabilizes, and links the acts of procreation and child rearing. While the plaintiffs argue that they only want to take part in the same stabilizing institution, the Legislature conceivably could conclude that permitting their participation would have the unintended effect of undermining to some degree marriage's ability to serve its social purpose. See *Commonwealth* v. *Stowell,* 389 Mass. 171, 175 (1983) (given State's broad concern with institution of marriage, it has "legitimate interest in prohibiting conduct which may threaten that institution").

So long as marriage is limited to opposite-sex couples who can at least theoretically procreate, society is able to communicate a consistent message to its citizens that marriage is a (normatively) necessary part of their procreative endeavor; that if they are to procreate, then society has endorsed the institution of marriage as the environment for it and for the subsequent rearing of their children; and that benefits are available explicitly to create a supportive and conducive atmosphere for those purposes. If society proceeds similarly to recognize marriages between same-sex couples who cannot procreate, it could be perceived as an abandonment of this claim, and might result in the mistaken view that civil marriage has little to do with procreation: just as the potential of procreation would not be necessary for a marriage to be valid, marriage would not be necessary for optimal procreation and child rearing to occur.[34] In essence, the Legislature could conclude that the consequence

---

forward does not preordain a result which neither the people nor their elected representatives may yet be prepared to accept.

[34]The court contends that the exclusive and permanent commitment of the marriage partnership rather than the begetting of children is the sine qua non of civil marriage, *ante* at 332, and that "the 'marriage is procreation' argument singles out the one unbridgeable difference between same-sex and opposite-sex couples, and transforms that difference into the essence of legal marriage." *Ante* at 333. The court has it backward. Civil marriage is the product of society's critical need to manage procreation as the inevitable consequence of intercourse between members of the opposite sex. Procreation has always been at the root of marriage and the reasons for its existence as a social institution. Its structure, one man and one woman committed for life,

of such a policy shift would be a diminution in society's ability to steer the acts of procreation and child rearing into their most optimal setting.[35] *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.*, 344 Mass. 695, 700 (1962) ("Legislative classification is valid if it is rational and bears *some* relationship to the object intended to be accomplished" [emphasis added]).

The court recognizes this concern, but brushes it aside with the assumption that permitting same-sex couples to marry "will not diminish the validity or dignity of opposite-sex marriage," *ante* at 337, and that "we have no doubt that marriage will continue to be a vibrant and revered institution." *Ante* at 340. Whether the court is correct in its assumption is irrelevant. What is relevant is that such predicting is not the business of the courts. A rational Legislature, given the evidence, could conceivably come to a different conclusion, or could at least

---

reflects society's judgment as how optimally to manage procreation and the resultant child rearing. The court, in attempting to divorce procreation from marriage, transforms the form of the structure into its purpose. In doing so, it turns history on its head.

The court compounds its error by likening the marriage statute to Colorado's "Amendment 2," which was struck by the United States Supreme Court in *Romer* v. *Evans*, 517 U.S. 620, 633 (1996). That amendment repealed all Colorado laws and ordinances that barred discrimination against homosexuals, and prohibited any governmental entity from adopting similar statutes. The amendment withdrew from homosexuals, but no others, legal protection from a broad range of injuries caused by private and governmental discrimination, "imposing a broad and undifferentiated disability on a single named group." *Id.* at 632. As the Court noted, its sheer breadth seems "inexplicable by anything but animus toward the class it affects." *Id.* The comparison to the Massachusetts marriage statute, which limits the institution of marriage (created to manage procreation) to opposite-sex couples who can theoretically procreate, is completely inapposite.

[35]Although the marriage statute is overinclusive because it comprehends within its scope infertile or voluntarily nonreproductive opposite-sex couples, this overinclusiveness does not make the statute constitutionally infirm. See *Massachusetts Fed'n of Teachers* v. *Board of Educ.*, 436 Mass. 763, 778 (2002) ("Some degree of overinclusiveness or underinclusiveness is constitutionally permissible . . ."). The overinclusiveness present here is constitutionally permissible because the Commonwealth has chosen, reasonably, not to test every prospective married couple for fertility and not to demand of fertile prospective married couples whether or not they will procreate. It is satisfied, rather, to allow every couple whose biological opposition makes procreation theoretically possible to join the institution.

harbor rational concerns about possible unintended consequences of a dramatic redefinition of marriage.[36]

There is no question that many same-sex couples are capable of being good parents, and should be (and are) permitted to be so. The policy question that a legislator must resolve is a different one, and turns on an assessment of whether the marriage structure proposed by the plaintiffs will, over time, if endorsed and supported by the State, prove to be as stable and successful a model as the one that has formed a cornerstone of our society since colonial times, or prove to be less than optimal, and result in consequences, perhaps now unforeseen, adverse to the State's legitimate interest in promoting and supporting the best possible social structure in which children should be born and raised. Given the critical importance of civil marriage as an organizing and stabilizing institution of society, it is eminently rational for the Legislature to postpone making fundamental changes to it until such time as there is unanimous scientific evidence, or popular consensus, or both, that such changes can safely be made.[37]

There is no reason to believe that legislative processes are

[36]Concerns about such unintended consequences cannot be dismissed as fanciful or far-fetched. Legislative actions taken in the 1950's and 1960's in areas as widely arrayed as domestic relations law and welfare legislation have had significant unintended adverse consequences in subsequent decades including the dramatic increase in children born out of wedlock, and the destabilization of the institution of marriage. See Nonmarital Childbearing in the United States 1940-99, National Center for Health Statistics, 48 Nat'l Vital Stat. Reps. at 2 (Oct. 2000) (nonmarital childbirths increased from 3.8% of annual births in 1940 to 33% in 1999); M.D. Bramlett, Cohabitation, Marriage, Divorce, and Remarriage in the United States, National Center for Health Statistics, Vital & Health Stat. at 4-5 (July 2002) (due to higher divorce rates and postponement of marriage, proportion of people's lives spent in marriage declined significantly during later half of Twentieth Century).

[37]"[T]he State retains wide latitude to decide the manner in which it will allocate benefits." Moe v. Secretary of Admin. & Fin., 382 Mass. 629, 652 (1981). To the extent that the Legislature concludes that one form of social relationship is more optimal than another for the bearing and raising of children, it is free to promote and support the one and not the other, so long as its conclusion is rational, and does not discriminatorily burden the exercise of a fundamental right. Id. Cf. Rust v. Sullivan, 500 U.S. 173, 192-193 (1991) ("Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problems in another way").

inadequate to effectuate legal changes in response to evolving evidence, social values, and views of fairness on the subject of same-sex relationships.[38] Deliberate consideration of, and incremental responses to rapidly evolving scientific and social understanding is the norm of the political process — that it may seem painfully slow to those who are already persuaded by the arguments in favor of change is not a sufficient basis to conclude that the processes are constitutionally infirm. See, e.g., *Massachusetts Fed'n of Teachers* v. *Board of Educ.*, 436 Mass. 763, 778 (2002); *Mobil Oil* v. *Attorney Gen.*, 361 Mass. 401, 417 (1972) (Legislature may proceed piecemeal in addressing perceived injustices or problems). The advancement of the rights, privileges, and protections afforded to homosexual members of our community in the last three decades has been significant, and there is no reason to believe that that evolution will not continue. Changes of attitude in the civic, social, and professional communities have been even more profound. Thirty years ago, The Diagnostic and Statistical Manual, the seminal handbook of the American Psychiatric Association, still listed homosexuality as a mental disorder. Today, the Massachusetts Psychiatric Society, the American Psychoanalytic Association, and many other psychiatric, psychological, and social science organizations have joined in an amicus brief on behalf of the plaintiffs' cause. A body of experience and evidence has provided the basis for change, and that body continues to mount. The Legislature is the appropriate branch, both constitutionally and practically, to consider and respond to it. It is not enough that we as Justices might be personally of the view that we have learned enough to decide what is best. So long as the question is at all debatable, it must be the Legislature that decides. The marriage statute thus meets the requirements of the

---

[38]Legislatures in many parts of the country continue to consider various means of affording same-sex couples the types of benefits and legal structures that married couples enjoy. For example, in 1999 the California Legislature established the first Statewide domestic partner registry in the nation, and in each of the years 2001, 2002, and 2003 substantially expanded the rights and benefits accruing to registered partners. Cal. Fam. Code §§ 297 et seq. (West Supp. 2003). See also comments of Massachusetts Senate President Robert Travaglini to the effect that he intends to bring civil union legislation to the floor of the Senate for a vote. Mass. Senate Eyes Civil Unions: Move Comes as SJC Mulls Gay Marriages, Boston Globe, Sept. 7, 2003, at A1.

rational basis test. Accord *Standhardt* v. *Superior Court*, 77 P.3d 451 (Ariz. Ct. App. 2003) (marriage statutes rationally related to State's legitimate interest in encouraging procreation and child rearing within marriage); *Baker* v. *Nelson*, 291 Minn. 310, 313 (1971) ("equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the state's classification of persons authorized to marry"); *Singer* v. *Hara*, 11 Wash. App. 247, 262-263 (1974) ("There can be no doubt that there exists a rational basis for the state to limit the definition of marriage to exclude same-sex relationships").

D. *Conclusion.* While "[t]he Massachusetts Constitution protects matters of personal liberty against government incursion as zealously, and often more so, than does the Federal Constitution," *ante* at 328, this case is not about government intrusions into matters of personal liberty. It is not about the rights of same-sex couples to choose to live together, or to be intimate with each other, or to adopt and raise children together. It is about whether the State must endorse and support their choices by changing the institution of civil marriage to make its benefits, obligations, and responsibilities applicable to them. While the courageous efforts of many have resulted in increased dignity, rights, and respect for gay and lesbian members of our community, the issue presented here is a profound one, deeply rooted in social policy, that must, for now, be the subject of legislative not judicial action.